MILTON C. WEILER, JR. *vs.* PORTFOLIOSCOPE, INC., & others.[1]

No. 12-P-261.

Suffolk. October 10, 2012. - February 1, 2013.

Present: GRASSO, FECTEAU, & AGNES, JJ.

Further appellate review granted, 465 Mass. 1105 (2013).

*Secured Transactions. Uniform Commercial Code,* Secured creditor, Secured
   transaction, Good faith. *Corporation,* Stock. *Contract,* Performance and
   breach, Implied covenant of good faith and fair dealing, Interference with
   contractual relations. *Conversion. Consumer Protection Act,* Unfair or
   deceptive act. *Uniform Fraudulent Transfer Act.*

In a civil action arising from a stock option purchase and sale agreement
   between the plaintiff and one of the defendants, the judge erred in determin-
   ing that the agreement gave the plaintiff an enforceable claim against the
   actual proceeds from the settlement of a lawsuit rather than a general claim
   against the defendant's assets and that the plaintiff's claim took priority
   over a third party's security interest in those proceeds. [222-226]
In a civil action arising from a stock option purchase and sale agreement
   between the plaintiff and one of the defendants, a corporation, the judge
   erred in determining that the corporate defendant committed a breach of the
   covenant of good faith and fair dealing when it paid one of the individual
   defendants an amount from the proceeds from the settlement of a lawsuit,
   where the payment was directed by a secured creditor, to be paid by the
   corporate defendant as the secured creditor's debtor [226-227]; further, the
   judge erred in determining that a second individual defendant intentionally
   interfered with the plaintiff's right to receive a certain amount of the proceeds
   from the settlement of the lawsuit, where the plaintiff did not sustain his
   burden of showing that the second individual defendant, who had pervasive
   control of the company that owned ninety percent of the corporate defend-
   ant, acted with malice, and where the second individual defendant's purpose
   was the legitimate advancement of the defendants' economic interest
   [227-229].
In a civil action arising from a stock option purchase and sale agreement
   between the plaintiff and one of the defendants, the judge erred in determin-
   ing that the defendants, acting in concert, converted the plaintiff's right to
   receive payment from the settlement of a lawsuit to their own use, where
   neither the lawsuit nor the proceeds from its settlement were the property
   of the plaintiff. [229]
In a civil action arising from a stock option purchase and sale agreement
   between the plaintiff and one of the defendants, the judge erred in determin-
   ing that two individual defendants misled, hindered, and delayed the plaintiff

[1]Kevin B. Kimberlin and Joseph T. Whelihan.

from taking steps to insure or secure his right to proceeds from the settlement of a lawsuit, in violation of G. L. c. 93A, § 11, where the dispute constituted an internal business dispute, and where there was a complete absence of interactive business transactions involving independent business entities. [229-231]

In a civil action arising from a stock option purchase and sale agreement between the plaintiff and one of the defendants, a corporation, the judge erred in determining that the corporate defendant's transfers, at the direction of one of the individual defendants, of proceeds from the settlement of a lawsuit to which the plaintiff claimed a right to payment were fraudulent, where the individual defendant acted as a secured creditor and the holder of a demand note; where the transfers were made with fair consideration; and where the transfers did not render the corporate defendant insolvent. [231-233]

CIVIL ACTION commenced in the Superior Court Department on February 17, 2009.

The case was heard by *Margaret R. Hinkle,* J.

*Keith P. Carroll* for the defendants.

*Curtis Clark Pfunder* for the plaintiff.

FECTEAU, J. This is an appeal by the defendants, PortfolioScope, Inc. (PortfolioScope), Kevin B. Kimberlin, and Joseph T. Whelihan, from a judgment in favor of Milton C. Weiler, Jr., after a jury-waived trial in the Superior Court.[2] The principal question in this case arises from the application of a stock option purchase and sale agreement between PortfolioScope and Weiler. The defendants do not challenge the judge's decision that PortfolioScope breached the agreement with the plaintiff to pay five percent of the proceeds from a settlement related to a pending lawsuit between PortfolioScope and iFlex Solutions

---

[2]Weiler originally asserted claims: (1) against PortfolioScope, for breach of contract and the implied covenant of good faith and fair dealing (counts one and two); (2) against all defendants, for misrepresentation (count 4), violations of the Massachusetts Wage Act, G. L. c. 149, §§ 148, 150 (count five), breach of G. L. c. 93A, § 11 (count six), quantum meruit and unjust enrichment (counts seven and eight), conversion (count nine), equitable estoppel/promissory estoppel (count ten), civil conspiracy (count twelve), an accounting (count fourteen), and breach of the Uniform Fraudulent Transfer Act, G. L. c. 109A, §§ 1 et seq. (count fifteen); (3) against Kimberlin and Whelihan, for detrimental reliance (count eleven); and (4) against Kimberlin, for tortious interference with contract (count three) and "piercing the corporate veil" (count thirteen). The judge found for the plaintiff on counts one, two, three, six, nine, twelve, and fifteen.

Limited (the iFlex litigation). The total damages, as found by the judge, were $471,000.[3] The judge determined that the agreement gave Weiler priority of payment over a secured creditor of PortfolioScope, Kevin Kimberlin Partners, L.P. (KKP), an investment company directed by the defendant Kimberlin. The defendants contend that a misinterpretation of the agreement coupled with a misapplication of secured transactions principles resulted in the judge's erroneous conclusions that: (1) PortfolioScope breached the covenant of good faith and fair dealing with Weiler; (2) Kimberlin knowingly and intentionally interfered with PortfolioScope's performance under Weiler's contracts; (3) all defendants converted funds properly belonging to Weiler; (4) all defendants violated G. L. c. 93A, § 11, awarding Weiler double damages and attorney's fees; (5) all defendants violated G. L. c. 109A, the Uniform Fraudulent Transfer Act (UFTA); and (6) all defendants conspired against Weiler. We agree with the defendants and reverse.

1. *Background.* In the 1980's, Weiler developed certain financial portfolio software, in conjunction with forming two entities known as Computer Aided Decisions (CAD) and CAD Research. In 2000, Spencer Trask & Co. (Spencer Trask), a venture capital firm effectively controlled by Kimberlin, acquired Weiler's entities and thereafter merged them into PortfolioScope, with Weiler receiving consideration in the form of cash and stock options in the new entity.[4] Weiler was president and chief operating officer of PortfolioScope from January, 2000, until May, 2002. After he resigned those positions, he was retained as an independent consultant to PortfolioScope through the period in question.

Due to significant financial difficulties, by 2001 PortfolioScope had obtained a series of loans and had executed various financing agreements, the net effect of which rendered KKP a creditor of PortfolioScope. Although the value of PortfolioScope assets continued to decline, PortfolioScope anticipated a

---

[3]The judge additionally found that PortfolioScope breached various consulting agreements between itself and Weiler, with proven damages of about $81,000 offset by one $20,000 payment in 2009. The defendants do not challenge this ruling on appeal.

[4]Both Weiler and Kimberlin have a master's degree in business administration from Harvard Business School.

sizable recovery in connection with a claim that it maintained against iFlex Solutions, Ltd., for the theft of trade secrets of PortfolioScope's software (the iFlex litigation).

In 2001, Weiler sold his stock options to PortfolioScope in exchange for various percentages of certain expected revenue streams, including proceeds relating to the iFlex litigation, after legal fees were paid. When PortfolioScope settled the iFlex litigation, however, Kimberlin, as the principal of KKP, directed that PortfolioScope wire the entirety of the resulting proceeds to a Spencer Trask brokerage account and to Weiler's successor as a senior executive of PortfolioScope, the defendant Whelihan.

The defendants aver that each transfer of proceeds from the iFlex settlement made by PortfolioScope was lawful and at the direction of a secured creditor in satisfaction of a prior debt. Moreover, they argue that as a debtor, PortfolioScope had no authority to give Weiler a priority claim over that of a secured creditor[5] even if PortfolioScope was thereby unable to otherwise satisfy the legitimate claims of other creditors, such as Weiler. While the defendants' actions exposed PortfolioScope to a breach of its contract with Weiler, their actions did not otherwise subject the defendants to liability. We summarize the facts as found by the judge.

In early 2000, an entity closely affiliated with Spencer Trask acquired both CAD entities and Weiler's software, eventually combining the entities and changing their name to PortfolioScope. Ninety-five percent of the ownership of Spencer Trask is effectively controlled by Kimberlin, through "a very complex web of identities."[6] At the relevant times, Kimberlin was Spencer Trask's chairman of the board and only director.[7] Kimberlin also is the general partner of KKP.[8]

In 2001, PortfolioScope started to experience financial dif-

---

[5] No one disputes that KKP perfected its security interest in PortfolioScope after Weiler filed this lawsuit in Superior Court. This timing does not affect the premise that KKP was a secured creditor with priority over the proceeds from the iFlex settlement. See G. L. c. 106, §§ 9-201(a) & 9-317(a).

[6] Spencer Trask's beneficial owners are a variety of trusts and partnerships benefiting Kimberlin's wife and children (and a few business partners to a relatively minor extent).

[7] At the relevant time, Spencer Trask owned ninety percent of PortfolioScope.

[8] KKP's business address is Kimberlin's home address.

ficulty; at that time, its only assets were the "Global Portfolio Valuation" software designed by Weiler and certain claims for theft of trade secrets. In July, 2001, PortfolioScope executed a demand note in favor of Wachovia Bank, N.A. (Wachovia), for the amount of $4.01 million, together with a security agreement in all of PortfolioScope's property, including deposit accounts and cash.[9] To further secure the performance of PortfolioScope, this note was guaranteed by KKP, in whose favor PortfolioScope executed a security agreement. This security agreement expressly stated that PortfolioScope, as a debtor, had no authority to further encumber the collateral in which KKP maintained a security interest.[10] In July, 2002, having paid PortfolioScope's indebtedness to Wachovia in full, KKP acquired by assignment all of Wachovia's rights and interests in connection with PortfolioScope's obligations under the note and security agreement.[11] By the time PortfolioScope settled the iFlex litigation in 2008, PortfolioScope's indebtedness to KKP amounted to between $7 and $8 million.[12]

---

[9]This note was in modification of an earlier note, signed in February, 2001, for $3.1 million. In connection with KKP's guaranty of that note, a security interest was granted to KKP by PortfolioScope. The first indebtedness of PortfolioScope to Wachovia Bank appears, on this record, to have been in May, 2000, represented by a note for $300,000.

[10]Section 9 of the security agreement states:

> "Transfers and [o]ther [l]iens. No [d]ebtor shall (i) sell, assign (by operation of law or otherwise) or otherwise dispose of, or grant any option with respect to, any of the [c]ollateral, except in the ordinary course of business and which will not otherwise materially impact the value of the [c]ollateral, or (ii) create or permit to exist any lien, security interest, option or other charge or encumbrance upon or with respect to any of the [c]ollateral, except for the security interest under this [a]greement and as otherwise permitted in the [t]ransaction [d]ocuments (as defined in [s]ection 14.)"

[11]KKP paid Wachovia the amount of approximately $4.024 million.

[12]As found by the judge, between October 1, 2003, and October 9, 2008, PortfolioScope had also executed a series of seven senior secured promissory notes (notes) for additional loans made by KKP to PortfolioScope: on October 1, 2003, for $250,000; on September 1, 2007, for $150,000; on November 29, 2007, for $200,000; on June 17, 2008, for $157,000; on August 20, 2008, for $250,000; on October 1, 2008, for $65,000; and on October 9, 2008, for $200,000. The total principal amount of these notes was $1,272,000 and the total principal and interest amount of the July 25, 2001, demand note assumed by KKP was $5,282,000.

In January, 2002, Weiler resigned as PortfolioScope's president, and the defendant Whelihan took over the position. On February 13, 2002, Weiler and PortfolioScope entered into a stock option purchase and sale agreement (agreement), which was amended on October 21, 2002 (amendment).[13] The effect of the agreement is at the heart of this controversy. The agreement requires that PortfolioScope shall pay Weiler, in exchange for Weiler's sale of his options to PortfolioScope, five percent of its net proceeds received in connection with the iFlex litigation. As used in the agreement, the terms "net proceeds" or "net recovery" mean gross proceeds less legal fees due PortfolioScope's counsel.

On October 21, 2008, the iFlex litigation was settled in principle, with PortfolioScope to receive a lump-sum payment of $10 million, which was received by its law firm on November 7, 2008. After deducting legal fees in the approximate amount of $1.8 million, the firm wired the net recovery of approximately $8.2 million to PortfolioScope on November 12, 2008;[14] at Kimberlin's direction, Whelihan then transferred more than $7.7 million of the settlement proceeds to Spencer Trask.[15]

Furthermore, on November 17, 2008, at the direction of Kimberlin, Whelihan disbursed $500,000 of the iFlex proceeds to

---

[13]The judge also found the following:

> "The [agreement] and the amendment were drafted by Weiler's attorney. Under the [a]greement, Weiler agreed to sell back to PortfolioScope 666,667 vested and unvested PortfolioScope stock options. In exchange, the [a]greement provided that PortfolioScope would pay Weiler a contingent purchase price, one part of which consisted of '[f]ive . . . percent of the net proceeds (or net recovery) to the [c]ompany in connection with the two pending lawsuits between PortfolioScope and Citi-Corp (and its affiliates) [the iFlex litigation] whether as the result of a judgment by a court or a settlement between the parties.' "

[14]Under the terms of the agreement, Weiler was to receive $410,000 (plus approximately $70,000 in hourly fees due from his consulting contracts). The amount PortfolioScope owes to Weiler is undisputed.

[15]This was accomplished in two transfers into a brokerage account controlled by Kimberlin: the first, which occurred on November 12, 2008, of $5.2 million; and the second, on November 17, 2008, of $1.296 million. Another $1.231 million was also ordered transferred to the Spencer Trask account, but this was to be sent to attorneys for Charles Hunt to hold in escrow, to comply with an injunctive order of a Superior Court judge entered on November 14, 2008, in light of a "perfected security interest" held by Hunt.

himself, through a wire to a money market fund in his wife's name.[16] Weiler was not paid, nor was he informed by Kimberlin or Whelihan of their actions; instead, as found by the judge, he was "misled . . . for weeks about his payment, preventing him . . . from taking other action to secure payment." However, the judge specifically found that Weiler was not a secured creditor of PortfolioScope.

2. *Discussion.* The judge concluded that Weiler had a preferred claim on five percent of the actual settlement proceeds from the iFlex litigation, by virtue of the agreement. As a result, the judge ruled that the transfer of the settlement proceeds by the defendants to others without paying Weiler from those funds amounted not only to a breach of contract by PortfolioScope, but also violated its covenant of good faith and fair dealing, UFTA, and c. 93A, and constituted tortious acts, including conversion and improper interference with contractual rights.

The defendants contend that the agreement did not give Weiler a preferred claim on the actual settlement proceeds but rather an unsecured general claim against PortfolioScope; consequently, they argue that Weiler's claim for five percent of the actual settlement proceeds was not superior to the security interest of KKP and that the judge's decision to the contrary was a combination of a misinterpretation of the contract and a misapplication of the law of secured transactions. As it has overarching importance to the resolution of most aspects of this controversy, we begin with the interpretation of the contract.

a. *The contract.* The interpretation of a contract raises only a question of law. *Cody* v. *Connecticut Gen. Life Ins. Co.*, 387 Mass. 142, 146 (1982). The application of contract language to known facts also presents a question of law. *Kelleher* v. *American Mut. Ins. Co.*, 32 Mass. App. Ct. 501, 503 (1992). "In interpreting a contract, [t]he objective is to construe the contract as a whole, in a reasonable and practical way, consistent with its language, background, and purpose. The words of a contract must be considered in the context of the entire contract rather

---

[16]Whelihan transferred another $15,000 to himself on November 25, 2008, authorized by Kimberlin. The judge did not credit Whelihan's testimony that his receipt of these funds was for his past services and found that there was "no proper basis for this payment."

than in isolation." *Rubin* v. *Murray*, 79 Mass. App. Ct. 64, 75-76 (2011) (quotations and citations omitted). See *MacDonald* v. *Hawker*, 11 Mass. App. Ct. 869, 873 (1981), quoting from *Crimmins & Pierce Co.* v. *Kidder Peabody Acceptance Corp.*, 282 Mass. 367, 375 (1933) ("The intent of the parties must be gathered from a fair construction of the contract as a whole and not by special emphasis upon any one part").

In connection with her interpretation, and as pertinent to the issue, the judge relied on the following language from the agreement:

> "[T]he [c]ompany shall pay to Weiler as follows: [f]ive percent of the net proceeds (or net recovery) to the [c]ompany in connection with any claims by the [c]ompany against Citicorp (and its affiliates) [the iFlex litigation] related to copyright infringement and/or theft of confidential information and trade secrets. *The term net proceeds or net recovery as used in this [s]ection shall mean gross proceeds less legal fees of the [c]ompany's counsel.*" (Emphasis added.)

From this, the judge concluded that "under the plain language of the . . . agreement, PortfolioScope was required to pay Weiler [five percent] of the $10 million (the 'gross proceeds'), less the legal fees. The . . . agreement does not mention any creditor, secured or unsecured, having priority over Weiler except counsel."

Whether the judge erred in interpreting this contract, and in her determination of the defendants' liability on all claims other than breach of contract, depends upon the resolution of two subsidiary issues: first, did the agreement give Weiler an enforceable claim against the actual settlement proceeds rather than a general claim against PortfolioScope's assets; and second, if Weiler's claim is enforceable, did it take priority over KKP's security interest in the same.[17] We conclude that the language of the agreement does not support an affirmative finding on either issue.

---

[17]As found by the judge, KKP had assumed the rights of Wachovia to the promissory note owed by PortfolioScope and, in addition, had a separate security interest in the assets of PortfolioScope in its own favor, all of which were executed prior to the execution of the agreement, the validity and enforceability of which the plaintiff does not dispute.

The plaintiff contends that the plain and unmistakable meaning of the agreement was that he would be paid from the actual settlement proceeds. We, however, do not view the language as conveying such intent. Examining this particular payment obligation as part of the larger agreement and not in isolation, our view is that this payment was simply one of several parts of the consideration due Weiler for the sale of his stock options back to the company — a context that has not been afforded its proper place in the judge's analysis. Even if this view of the contract is not mandated, there is no plainly worded intention to give Weiler five percent of the actual settlement proceeds. While this might lead to a discussion in which the apparent ambiguity is resolved, it is unnecessary to do so here given another compelling basis for our conclusion.

The defendants contend, and the judge found, that Weiler's rights in the settlement proceeds were only those of an unsecured general creditor of PortfolioScope.[18] Moreover, as between Weiler and PortfolioScope, and apart from the security interest of KKP, there is no dispute that the iFlex cause of action was the property of PortfolioScope. When PortfolioScope's rights in the litigation were transformed by settlement and liquidated into cash, the proceeds, while still the property of PortfolioScope, became subject to any valid security interests therein, thus requiring a determination as to which party, KKP or Weiler, maintained priority of payment.

The judge found and ruled that KKP had, with respect to PortfolioScope, a valid and enforceable security interest in, inter alia, "all proceeds of any assets and cash, up to the full amount of the guarantees given by KKP."[19] These rights were initially

---

[18]As defined by G. L. c. 106, § 9-102(73), a "[s]ecurity agreement" means an "agreement that creates or provides for a security interest." As defined generally in G. L. c. 106, § 1-201(37), a "[s]ecurity interest" means an "interest in personal property or fixtures which secures payment or performance of an obligation. The term also includes any interest of a consignor and a buyer of accounts, chattel paper, a payment intangible, or a promissory note in a transaction that is subject to Article 9 . . . ."

[19]As found by the judge, "Weiler does not dispute that KKP . . . made these loans to PortfolioScope, or that the documents supporting these transactions were validly executed and enforceable." On appeal, Weiler does not dispute the validity or enforceability of the documents underlying KKP's loan to PortfolioScope or KKP's security interest in the contested collateral.

established by the security agreement and UCC statement filed in January, 2001, and subsequently purchased by KKP, which then perfected its security interest by filing a financing statement in August, 2009. Because Weiler had no rights as a statutory lienholder or as a secured party, the judge interpreted the agreement as granting Weiler an assignment or ownership interest in five percent of the actual settlement funds. The judge ruled that the assignment to Weiler of five percent of the settlement proceeds had priority over the secured interest of KKP in the same. We do not view the agreement as contemplating or expressing this intent.

While "[n]o particular form of words or of conduct is necessary to constitute . . . an assignment[,] '[a] valid assignment may be made by any words or acts which fairly indicate an intention to make the assignee the owner of a claim.'" *Kagan v. Wattendorf & Co.*, 294 Mass. 588, 596 (1936), quoting from *Cosmopolitan Trust Co.* v. *Leonard Watch Co.*, 249 Mass. 14, 19 (1924). The agreement utilized no words demonstrating an intent to give Weiler an ownership interest in either the cause of action or the resulting proceeds.

Moreover, this result fails to account for PortfolioScope's lack of authority to encumber collateral previously securitized in favor of KKP. An assignee can acquire only the rights that the assignor had the right and authority to give. See *Chartrand v. Chartrand*, 295 Mass. 293, 296 (1936) ("An assignment is a transfer in whole or in part of the rights of the assignor"). See also *Grise* v. *White*, 355 Mass. 698, 701 (1969). Pursuant to section 9 of KKP's security agreement (see note 10, *supra*), PortfolioScope maintained no authority to assign any rights with respect to the collateral. For a priority dispute to have been properly resolved in Weiler's favor, therefore, KKP must have subordinated its security interest in the settlement proceeds to the interest of Weiler; Weiler does not aver this to be the case, nor does the record otherwise support such a finding. See G. L. c. 106, § 1-209 ("An obligation may be issued as subordinated to payment of another obligation of the person obligated, or a creditor may subordinate his right to payment of an obligation by agreement with either the person obligated or another creditor of the person obligated").

Furthermore, even assuming that the agreement operated as an assignment and that PortfolioScope was within the scope of its authority in so granting an assignment to Weiler, Weiler's rights in the proceeds still cannot take priority over the rights of KKP in the same; the resolution of priority conflicts is governed by the general rule "first in time, first in right".[20] See *Middlesex Sav. Bank* v. *Johnson,* 777 F. Supp. 1024, 1027 (D. Mass. 1991). See also H. Lemelman, Manual on Uniform Commercial Code § 9:65 (revised 3d ed. 2012) ("Subject to certain special rules with regard to 'proceeds' [§ 9-102(*a*)(64)] of particular types of collateral, . . . [G. L. c. 106,] § 9-322[*b*][1] continues the earlier rule found in former [G. L. c. 106,] § 9-312[6]. Even though a security interest cannot attach until the debtor has rights in the collateral, under § 9-203, § 9-322[*b*][1] provides that the timing of the priority in the original collateral will determine the priority in the 'proceeds' thereof"). The security interests acquired by KKP were created prior to any rights or interests that Weiler had as a putative assignee. Therefore, since Weiler was an unsecured creditor, whatever the nature of his interest in the settlement proceeds, it was not superior to KKP's prior security interest in those same assets.

b. *Covenant of good faith and fair dealing.* The judge ruled that PortfolioScope breached the covenant of good faith and fair dealing when it paid Whelihan $515,000 from the settlement proceeds, finding Whelihan to be "neither a secured creditor nor otherwise entitled to these funds."[21] She concluded that "[t]here is simply no tenable argument that the [five percent]

---

[20]General Laws c. 106, § 9-322(*a*), added by St. 2001, c. 26, § 39, provides, in pertinent part:

> "Except as otherwise provided in this section, priority among conflicting security interests . . . in the same collateral is determined according to the following rules: (1) Conflicting perfected security interests . . . rank according to priority in time of filing or perfection. Priority dates from the earlier of the time a filing covering the collateral is first made or the security interest . . . is first perfected, if there is no period thereafter when there is neither filing nor perfection."

[21]The judge stated in her findings and rulings:

> "I discredit Whelihan's assertion that he had been working for many years without compensation, as he had been receiving a monthly retainer

agreement permitted PortfolioScope to make any payment to Whelihan before paying Weiler." To remain consistent with her view of the contract, the judge was required to conclude that the payment to Whelihan was not a payment directed by KKP, a secured creditor, to be paid by PortfolioScope as KKP's debtor, but rather a payment made at the unfettered discretion of PortfolioScope to satisfy some interest of its own. This was error. See, e.g., G. L. c. 106, § 9-405(*a*) (upon receipt of notification that an amount due has been assigned, "the account debtor may discharge its obligation by paying . . . the assignee and may not discharge the obligation by paying the assignor").

c. *Interference with contractual relations by Kimberlin.* The judge ruled that Kimberlin intentionally interfered with Weiler's right to receive five percent of the settlement proceeds when he "authoriz[ed] Whelihan's receipt of $515,000 of the proceeds, and Weiler has shown that Kimberlin's interference was with improper means and ill motive."

"To prevail on a claim of tortious interference with a contract, a plaintiff must establish (1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions. Where the defendant is a corporate official acting in the scope of his corporate responsibilities, a plaintiff has a heightened burden of showing the improper motive or means constituted 'actual malice,' that is, 'a spiteful, malignant purpose, unrelated to the legitimate corporate interest.' " *Psy-Ed Corp.* v. *Klein*, 459 Mass. 697, 715-716 (2011), quoting from *Blackstone* v. *Cashman*, 448 Mass. 255, 260-261 (2007) (quotations and citation omitted).

---

of $9,000 from Spencer Trask. . . . If the credible evidence were simply that PortfolioScope paid a secured creditor before Weiler, this [c]ourt would not necessarily conclude that there was also a breach of the implied covenant. However, here PortfolioScope paid $515,000, or more than [five percent] of the proceeds of the iFlex settlement, to Whelihan, who was neither a secured creditor or otherwise entitled to these funds. There is simply no tenable argument that the [five percent] [a]greement permitted PortfolioScope to make any payment to Whelihan before paying Weiler."

As explained in *Blackstone,* in observing that the term "individual official" was not expressly defined in connection with the application of "the actual malice standard," it was not intended that "individual official[s] of the employer" be narrowly construed; instead, cases have "treat[ed] the term expansively[,]" applying this more burdensome standard not only to high level corporate officers, but directors involved in management, as well, including shareholder-directors actively involved in management. *Blackstone, supra* at 266. See *King* v. *Driscoll,* 418 Mass. 576, 587 (1994). Furthermore, *Blackstone* provides: "nothing in these precedents requires a defendant to make a threshold showing of day-to-day involvement in order to be treated as a 'corporate official' entitled to the protections of the actual malice standard when his actions are 'directed toward corporate purposes.' " *Blackstone, supra* (citation omitted).

Here, Kimberlin's role as chairman of the board and sole director of Spencer Trask evinced his pervasive control of the ownership of that company which in turn owned ninety percent of PortfolioScope — thereby triggering the application of the actual malice standard in assessing whether Kimberlin tortiously interfered with Weiler's rights under the agreement. Indeed, the judge found that Kimberlin had authority to resolve, on behalf of PortfolioScope, the iFlex litigation by agreeing to the $10 million dollar settlement. Under these circumstances, Weiler bore the burden of proving actual malice on the part of Kimberlin. He did not do so, nor did the judge hold him to that standard.

Even if it cannot be said that Kimberlin actively engaged in the management of PortfolioScope, reversal is still required. In authorizing Whelihan to wire money to an account in his wife's name, Kimberlin did not induce PortfolioScope to break a contract with Weiler; rather, Kimberlin's direction to Whelihan constituted an action well within the purview of KKP's authority as a priority creditor. Under the instant circumstances, this is not tortious interference with the agreement. "Because the defendant's purpose was the legitimate advancement of its own economic interest, that motive is not 'improper' for purposes of a tortious interference claim. That the plaintiff may have suffered a loss as a consequence of the defendant's pursuit of its

own interest is a by-product of a competitive marketplace; it does not render the defendant's effort tortious." *Pembroke Country Club, Inc.* v. *Regency Sav. Bank, F.S.B.*, 62 Mass. App. Ct. 34, 39 (2004) (citation omitted).

d. *Conversion against all defendants.* The judge concluded "that the defendants, acting in concert, converted Weiler's rightful portion of the iFlex settlement to their own use." "Conversion consists of a wrongful exercise of dominion or control over the personal property of another." *Cahaly* v. *Benistar Property Exch. Trust Co.*, 68 Mass. App. Ct. 668, 679 (2007), *S.C.*, 451 Mass. 343 (2008). As discussed above, neither the iFlex cause of action nor the proceeds from its settlement were the property of Weiler, and therefore, the defendants could not properly be considered as having converted them.

e. *Violation of G. L. c. 93A, § 11.* In assessing c. 93A, § 11, liability the judge determined that Kimberlin and Whelihan misled, hindered, and delayed Weiler from taking steps to insure or secure his right to payment from the settlement proceeds.[22] We do not disagree with the judge's conclusions that the defendants' actions, from the time that the settlement proceeds were collected until the time that Weiler filed suit, were intended to delay Weiler and lead him into a false sense of security, especially given the advantage that the defendants had in their knowledge of the security interests of KKP.[23] Such conduct can amount to unfair and deceptive actions. "Failure to disclose a material fact

---

[22]The judge stated:

> "Despite PortfolioScope's obligation to pay Weiler from the proceeds of the iFlex settlement, and Kimberlin and Whelihan's repeated assurance that he would receive payment, PortfolioScope did not pay him. Rather, at the direction of Kimberlin, Whelihan disbursed more than $7.7 million of the settlement proceeds to Spencer Trask, a company Kimberlin controlled. From there, the proceeds were directed to KKP, L.P., which Kimberlin also controlled, and from which his relatives would receive financial benefits. Also, at the direction of Kimberlin, Whelihan disbursed $515,000 of the iFlex proceeds to himself, through a wire to a money market fund in his wife's name. Then, instead of informing Weiler of their actions, Kimberlin, Whelihan, and others at their direction, misled him for weeks about his payment, preventing him, among other things, from taking other action to secure payment. These repeated acts of impropriety violate [c.] 93A, § 11."

[23]While we recognize that neither Kimberlin, Whelihan, nor the prior chief

that causes a party to act differently with respect to a transaction than it otherwise would have has been held sufficient to support a finding of c. 93A liability in a business context." *Brewster Wallcovering Co.* v. *Blue Mountain Wallcoverings, Inc.*, 68 Mass. App. Ct. 582, 607 n.57 (2007), and collected cases.

However, the dispute here arose out of a private transaction between PortfolioScope and Weiler in his role as a former employee and options holder of the company. See *Psy-Ed Corp.* v. *Klein*, 459 Mass. at 719 (dispute between the defendant, a former employee and shareholder of the plaintiff company who, by counterclaim, alleged a violation of G. L. c. 93A, § 11, and the plaintiff involving, inter alia, a settlement agreement in which the plaintiff reacquired all of the defendant's shares in the company in exchange for certain payments, was not commercial in nature where "despite the complex entanglement of the parties . . . , the context in which they were operating was a single business enterprise"). See also *Grand Pac. Fin. Corp.* v. *Brauer*, 57 Mass. App. Ct. 407, 416 n.7 (2003), and cases cited (noting cases "holding G. L. c. 93A inapplicable to disputes involving a single entity, such as a partnership or close[] corporation"); *Zimmerman* v. *Bogoff*, 402 Mass. 650, 651, 662-663 (1988) (two shareholders in close corporation); *Szalla* v. *Locke*, 421 Mass. 448, 451-452 (1995) (partnership); *Newton* v. *Moffie*, 13 Mass. App. Ct. 462, 466-468 (1982) (partners in management of trust property).

Moreover, in this case there is a complete absence of "the distinguishing mark for G. L. c. 93A applicability, i.e., interactive business transactions but with independent business entities."

executive officer of PortfolioScope had apparently informed Weiler, at the time of the signing of the agreement, of the priority position that KKP had in the proceeds, we ascribe no improper motive in their failure to disclose KKP's priority at the time the agreement was executed. The parties were then likely optimistic of a larger recovery from the iFlex litigation which may have obviated the situation insofar as there would have been more funds from the settlement to satisfy Weiler's claim. Moreover, Weiler cannot realistically assert that he would have acted differently had he known of the security interest at that time. We fail to see how his financial position would have been improved by retaining, in lieu of the agreement, ownership of his stock options; Weiler could not reasonably have failed to understand PortfolioScope's weak financial position at that time.

*Grand Pac. Fin. Corp.* v. *Brauer, supra.* "The development of the statute . . . suggests that the unfair or deceptive acts or practices prohibited are those that may arise in dealings between discrete, independent business entities, and not those that may occur within a single company." *Manning* v. *Zuckerman,* 388 Mass. 8, 12 (1983). As was stated in *Lantner* v. *Carson,* 374 Mass. 606, 607-608 (1978), "as broadly and expansively as the statute applies to the regulation of business practices, G. L. c. 93A is not available where the transaction is strictly private in nature, and is no way undertaken in the ordinary course of a trade or business" (citation omitted).

The agreement and any breach thereof constitute " 'an internal business dispute,' . . . outside the 'conduct of any trade or commerce' within the meaning of G. L. c. 93A."[24] *Cacciola* v. *Nellhaus,* 49 Mass. App. Ct. 746, 756 (2000), quoting from *Kurker* v. *Hill,* 44 Mass. App. Ct. 184, 191 (1998). Thus, G. L. c. 93A, § 11, does not apply here.[25]

f. *Violation of the Uniform Fraudulent Transfer Act.* Weiler claimed that PortfolioScope's transfers, at Kimberlin's direction, to Spencer Trask and Whelihan were fraudulent; the judge agreed, concluding that the payments were made with actual intent to hinder, delay, or defraud Weiler, citing G. L. c. 109A, § 5 (UFTA).[26] While acknowledging that the payment of one creditor in preference over another is not fraudulent, even if

[24]"The applicability of G. L. c. 93A, §§ 2(*a*) and 11, to interactions between two parties requires a dual inquiry: first, the court assesses whether the interaction is 'commercial' in nature, and second, it evaluates whether the parties were both engaged in 'trade or commerce,' and therefore acting in a 'business context.' " *Linkage Corp.* v. *Trustees of Boston Univ.,* 425 Mass. 1, 22-23, cert. denied, 522 U.S. 1015 (1997). The dispute here fails on both prongs.

[25]Moreover, even were we to have found that G. L. c. 93A applied, we fail to discern how Weiler was harmed, given our interpretation of the agreement and the superior disbursement rights of others and the legitimate exhaustion of the available funds. Weiler's application for appellate attorney's fees and costs in support of that request, pursuant to G. L. c. 93A, § 11, is denied.

[26]General Laws c. 109A, § 5, states:

"(*a*) A transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made . . . , if the debtor made the transfer . . . .:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor . . . ."

such payment renders it impossible for the debtor to pay other creditors, the judge nevertheless ruled that PortfolioScope did not act in good faith, but rather paid KKP to benefit Kimberlin and Whelihan, insiders of PortfolioScope, at Weiler's expense.

In determining that the transfers at issue were fraudulent, the judge emphasized the following facts: the transfers were made to PortfolioScope insiders; the transfers involved substantially all of PortfolioScope's assets, rendering it insolvent; Kimberlin and Whelihan attempted to conceal the transfers from Weiler, repeatedly delaying any response to Weiler's demands for the money owed to him under the agreement; KKP did not perfect its security interest until after Weiler commenced litigation, never disclosing to Weiler the preferred position of a secured creditor that prevented payment to him; and PortfolioScope received no value in exchange for the transfers to Whelihan. The judge explicitly did not credit the defendants' uncorroborated assertion that PortfolioScope owed Whelihan payment for past services.

However, as discussed above, the transfers were made at the instruction of KKP, a secured creditor and holder of a demand note. The transfers were made with fair consideration, since PortfolioScope received the full value of the transferred amounts credited to its debt. Moreover, the transfers to KKP did not render PortfolioScope insolvent: there was a judicial hold placed upon a portion of the iFlex settlement funds pursuant to a related proceeding against PortfolioScope.

"Something more is necessary than a simple knowledge on the creditor's part that the debtor did not intend that his other creditors should be paid, or even that he intended to put his property where his other creditors could not reach it. Such knowledge by the creditor of the purpose of the debtor, provided it is accompanied by a real payment in good faith of an actual debt, is no fraud at common law. . . . Before he can recover, [the plaintiff must] establish that the transfer was not, as it purported to be, a simple payment of a real debt, but a transaction whereby some clandestine benefit was to accrue to the debtor." *Lyon* v. *Wallace*, 221 Mass. 351, 353-354 (1915). See *Goldstein* v. *Columbia Diamond Ring Co.*, 366 Mass. 835, 838 (1975) ("If there is no secret trust agreed upon or understood

between the debtor and creditor in favor of the former, but the sole object of a transfer of property is to pay or secure the payment of a debt, the transaction is a valid one at common law").

It is undisputed that PortfolioScope's debt to KKP was real and, unlike situations in which a debtor was to gain some hidden benefit, the transfer of proceeds by PortfolioScope to KKP was in legitimate payment of its indebtedness. The transfers were not made by PortfolioScope to shield assets from its creditors but rather were made to pay KKP, a legitimate creditor. Therefore, the judgment on this claim cannot stand.

3. *Conclusion.* The judgment in favor of the plaintiff on the claim for breach of contract is affirmed. The remainder of the judgment in favor of the plaintiff is reversed and a new judgment on those counts is to enter in favor of the defendants.

*So ordered.*