K.G.M. Custom Homes, Inc. *vs.* Stephen J. Prosky
& others.[1]

Bristol. February 4, 2014. - May 29, 2014.

Present: Ireland, C.J., Spina, Cordy, Botsford, Gants, Duffly, & Lenk, JJ.

*Contract,* Sale of real estate, Performance and breach, Implied covenant of good faith and fair dealing, Damages, Specific performance, Provision for liquidated damages. *Real Property,* Sale, Purchase and sale agreement, Specific performance. *Damages,* Breach of contract, Liquidated damages, Attorney's fees. *Practice, Civil,* Election of remedies, Attorney's fees.

In a civil action arising from the attempt by the plaintiff to purchase land from the defendants, the judge properly concluded that the defendants anticipatorily repudiated the purchase and sale agreement when their attorney falsely told the plaintiff that the defendants had a higher offer and that the plaintiff should calculate its liquidated damages pursuant to the agreement, and that the attorney's attempt to scuttle the deal at closing constituted an actual breach of the implied covenant of good faith and fair dealing [253-255]; further, the judge did not err in allowing the plaintiff to elect either specific performance or liquidated damages as a remedy, where specific performance would have cost the plaintiff almost $300,000 more than it anticipated at the start of the action [255-258]; however, the judge erred in awarding the plaintiff attorney's fees incurred in connection with the litigation, where the liquidated damages clause of the agreement was ambiguous with respect to the recovery of fees incurred in the course of litigating a breach of the agreement and, therefore, the award represented a windfall for the plaintiff [258-259].

Civil action commenced in the Superior Court Department on December 21, 2004.

The case was heard by *Thomas F. McGuire, Jr.,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Michelle N. O'Brien* for the plaintiff.

*Edmund A. Allcock* (*Haley Byron* with him) for the defendants.

Cordy, J. On October 12, 1999, the defendants, Stephen J.

[1] Karen Monteiro and Joan Stormo.

Prosky, Karen Monteiro, and Joan Stormo (Proskys),[2] executed a purchase and sale agreement with the plaintiff, K.G.M. Custom Homes, Inc. (K.G.M.). The Proskys agreed to sell approximately 45.7 acres of land in Norton to K.G.M. for the purpose of developing residential homes, with the price to be determined by the number of "approved and permitted buildable house lot[s]," and the closing set for twenty-one days "after all final approvals are granted and the expiration of any and all appeal periods." In or about August, 2004, after a five-year process, during which time K.G.M. worked to gain approval for its development plan, and after a dispute over the calculated sale price, Peter T. Clark, the Proskys' attorney, falsely told one of K.G.M.'s attorneys that the Proskys had received a higher offer for the property and informed him that K.G.M. should calculate its damages based on the liquidated damages provision of the purchase and sale agreement. K.G.M. filed suit for specific performance. While the suit was pending, K.G.M. received final approval for its plan, and the parties met at the office of K.G.M.'s real estate attorney, Henry J. Sousa, Jr., in an attempt to close on the sale of the property. Due to Clark's withholding of information in the days leading up to the closing, as well as his behavior at the closing, the parties were unable to close the sale.

After a jury-waived trial, a Superior Court judge ruled that the Proskys anticipatorily repudiated the purchase and sale agreement when Clark told K.G.M. that the Proskys had a higher offer and to calculate its liquidated damages. The judge further found that Clark's "attempt to scuttle the deal" at closing constituted an actual breach of the implied covenant of good faith and fair dealing and, as a result, he allowed K.G.M. to choose either compensatory damages as provided by the liquidated damages provision of the purchase and sale agreement, or specific performance.[3] K.G.M. elected to receive compensatory damages.

On appeal, the Proskys do not contest the finding that they

---

[2]Stephen J. Prosky, Monteiro, and Stormo are siblings, and thus we refer to them by their familial last name.

[3]The trial judge also ruled, in favor of the defendants, that the sale price for the property was $1,050,000 as calculated based on the number of approved lots. The sale price is not contested here.

anticipatorily repudiated the agreement, but argue that their attorney's actions at the closing did not constitute an actual breach, and that therefore monetary damages were not available, as specific performance is the only recognized remedy for anticipatory repudiation. They further argue that it was K.G.M. who committed a breach of the agreement at the closing by failing to show that it was able to perform in accord with its terms. Additionally, the Proskys argue that K.G.M. failed to make a seasonable election of remedies where it did not amend its complaint to seek compensatory damages under the liquidated damages provision of the agreement. Finally, they argue that, even if they did commit an actual breach that properly gave rise to the judge's remedy, the judge erred in holding them liable for attorney's fees incurred in connection with the litigation of this matter.

In an unpublished memorandum and order pursuant to Appeals Court rule 1:28, a panel of the Appeals Court affirmed the judgment insofar as it awarded the plaintiffs specific performance, and reversed the judgment insofar as it awarded money damages and attorney's fees. *KGM Custom Homes, Inc.* v. *Prosky*, 81 Mass. App Ct. 1118 (2012). We granted K.G.M.'s application for further appellate review.

We conclude that the findings of the trial judge, based on the scope of the actual litigation, sufficiently established that the initial anticipatory repudiation of the agreement morphed into an actual breach by the Proskys, and not K.G.M., at the failed closing. Thus, the judge's decision offering K.G.M. a choice of remedy was proper, and an amendment of the complaint was not necessary. We further conclude that the judge erred in awarding K.G.M. attorney's fees incurred in litigating this suit where the liquidated damages clause of the agreement only contemplated attorney's fees incurred in connection with the underlying transaction. Therefore, we affirm the judge's decision except as to the awarding of attorney's fees.

1. *Background.* We summarize the relevant facts as found by the trial judge in his order for judgment.

The Proskys are three siblings who, together, own a sizeable plot of land on the north side of South Worcester Street in

Norton.[4] In 1999, the Proskys discussed the prospect of selling their land with David Joyce, their real estate broker, who suggested that the land could be developed for affordable housing. In facilitation of that end, Joyce put the Proskys in touch with K.G.M., a real estate development company located in North Easton and owned by Gregory Mills and his wife.[5]

On or about October 12, 1999, the parties executed a purchase and sale agreement, in which the Proskys agreed to sell lots 103, 103-02, and 103-03 to K.G.M.[6] at a purchase price that was to be determined based on the number of "approved and permitted buildable house lot[s]," after K.G.M. received the necessary permits and approval to develop residential housing.[7] The closing date was to be twenty-one days "after all final approvals are granted and the expiration of any and all appeal periods."

The agreement also contained a liquidated damages provision that specified that in the event of a breach by the Proskys, "the [Proskys] shall pay [K.G.M.], as liquidated damages, a sum of money equal to all charges and fees paid by [K.G.M.] in connection with this transaction, including but not limited to, attorney's fees."

After the execution of the agreement, K.G.M. began planning for its residential development, and spent several years acquiring the necessary permits. Although the zoning board of appeals of Norton (town) issued a decision in 2003 allowing sixty residential units, K.G.M. was forced to litigate an opposition to the project by the town's board of selectmen.

In May, 2004, while K.G.M. was discussing settlement op-

[4]All three Prosky siblings together own assessors' lots 103 and 103-02, which are a 44.5-acre plot of land and a thirty-three foot wide strip of land connecting lot 103 to South Worcester Street, respectively. Stormo individually owns assessors' lots 103-01 and 103-03, which lie between South Worcester Street and Lot 103. Lot 103-01 contains a house and garage.

[5]Gregory Mills is the president, treasurer, and (with his wife) coowner of K.G.M.

[6]After a dispute, the trial judge found that the agreement did not include Lot 103-01. That fact is not at issue here.

[7]The parties agreed that if the number of approved lots was thirty-five or more, the price would be $25,000 per lot. If it was between twenty-five and thirty-four lots, the price would be $22,500 per lot. If fewer than twenty-five lots were approved for residential dwellings, the price per lot would be $38,625.

tions in the civil suit with the board of selectmen, Clark took over as counsel for the Proskys. In August, 2004, Clark informed K.G.M.'s counsel in the civil suit that the Proskys had another offer to purchase the property at a substantially higher price. He stated his belief that the property was worth $75,000 per residential unit and attempted to renegotiate the price. He also told K.G.M.'s counsel to advise K.G.M. that it should calculate its damages pursuant to the liquidated damages clause in the agreement, because the Proskys no longer intended to sell the property to K.G.M.

Despite Clark's statements, K.G.M. still sought to close the transaction and executed a settlement agreement with the board of selectmen.[8] On December 3, 2004, after Joyce had attempted to contact Steven Prosky on behalf of K.G.M., Clark left a voice mail message for Joyce and instructed him not to have any further contact with the Proskys and that he had "a new offer on the table from another purchaser for that property."

It is undisputed that Clark never had a formal offer from any other party to purchase the property. The Proskys testified that they did not know of any other offer, and that they had no intention of backing out of the deal.

On December 21, 2004, K.G.M. filed suit against the Proskys alleging in its complaint that they had committed a breach of the implied covenant of good faith and fair dealing, and seeking specific performance of the agreed-on conveyance of the property for the price of $720,000.[9]

During the pendency of that suit, on April 29, 2005, K.G.M. received final approval for its proposed development plan. K.G.M.'s attorney informed the Proskys that K.G.M. was "ready, willing and able to close on the purchase," and that K.G.M. would appear for the closing on May 20, 2005, at Sousa's office.

---

[8]Under the terms of the settlement, K.G.M. received approval to build forty-two single family homes, with eleven of the homes on a single lot, and the remaining homes constructed on separate lots.

[9]In its complaint, K.G.M. also sought an unspecified award "in an amount sufficient to compensate [K.G.M.] for its damages"; attorney's fees, costs, and interest; and a judgment declaring that the Proskys violated G. L. c. 93A and an award of treble damages. The claim under G. L. c. 93A was dismissed by the judge and is not before us in this appeal.

In preparation for the closing, Clark prepared, and the Proskys signed, several legal documents necessary for the transaction.[10] However, Clark did not forward drafts of those documents to Sousa, or otherwise contact him, in the days leading up to the closing date. As a result, Sousa did not prepare any documents on behalf of K.G.M. for the closing, but was prepared to do so at his office during the closing.

On May 20, 2005, K.G.M. (i.e., Mills), Joyce, Stephen Prosky, and Clark all arrived at Sousa's office to attempt to close the transaction. Mills brought and produced a check from a $250,000 line of credit to pay his expenses, made payable to the Proskys.

Clark testified at his deposition that, at the time of the closing, he did not believe that the parties had a valid contract. At the closing, Clark, apparently acting on his own, brought a videographer with him to record the closing as a "defense strategy." Sousa objected to the recording, and the two engaged in a heated argument over the presence of the videographer.[11] When the parties finally attempted to complete the closing, Sousa asked Clark to show him the note and mortgage that Clark had prepared.

Clark refused to give the documents to Sousa, and instead held them up at a distance. When Sousa tried to take them, Clark again refused to turn them over for analysis. Instead, he held them up and asked Sousa if he could read them from two feet away.[12] Believing that the Proskys had no intention of agreeing to the closing, Sousa informed Clark that the proffered closing documents were unacceptable. As a result, Sousa and Clark could not agree on the purchase price and the parties never closed the sale.

[10]Those documents included a quitclaim deed from the Proskys to K.G.M., a quitclaim deed from Stormo to K.G.M., a promissory note to be signed by K.G.M. for the amount of $700,000, and a mortgage and collateral security agreement securing the promissory note.

[11]At one point, Sousa shut off the electricity to the entire building in order to prevent the videotaping, which the videographer circumvented by producing a battery.

[12]Stephen Prosky testified that he "couldn't quite believe what was going on," and that, once outside, he asked the videographer, "Can you explain to me what just happened?"

2. *The trial.* In November, 2009, a jury-waived trial was held on K.G.M.'s complaint. K.G.M. had not amended its complaint to claim a breach of the agreement beyond the repudiation communicated to K.G.M. in 2004, or to seek recovery under the liquidated damages provision of the agreement. However, in addition to evidence regarding the anticipatory repudiation, K.G.M. presented evidence pertaining to Clark's actions at the closing, evidence which was not objected to by the Proskys.

The judge found that the Proskys committed a breach of the implied covenant of good faith and fair dealing when Clark told K.G.M. to calculate its liquidated damages as the Proskys intended to sell to another buyer. He further found that the breach continued at the closing, when Clark attempted to "scuttle the deal" by bringing a videographer to record the event and by refusing to let Sousa handle the closing documents. He also found that the amount owed for the property would have been $1,050,000, as the Proskys claimed, and not $720,000, as K.G.M. had contended. Because his decision raised the price to be paid to secure specific performance, the judge ruled that K.G.M. could elect either specific performance or liquidated damages.

K.G.M. elected to receive liquidated damages. On December 10, 2010, after hearing on K.G.M.'s motion to amend the judgment, the judge awarded K.G.M. $495,483.66. The amount included $375,483.66 in permitting costs and attorney's fees incurred before the lawsuit, and $120,000 in attorney's fees incurred by K.G.M. in the course of the litigation.

3. *Discussion.* a. *The breach.* The Proskys' argument is predicated largely on the theory that the trial judge erred in awarding monetary damages because their only breach was anticipatory in nature.

With few exceptions, "[o]utside of the commercial law context, Massachusetts has not generally recognized the doctrine of anticipatory repudiation, which permits a party to a contract to bring an action for damages prior to the time performance is due if the other party repudiates." *Cavanagh* v. *Cavanagh*, 33 Mass. App. Ct. 240, 243 (1992). One such exception occurs where a seller of land informs the "holder of an enforceable

option" to purchase that he plans to sell the land to a third party. *Tucker* v. *Connors*, 342 Mass. 376, 381-382 (1961). The remedy for an anticipatory repudiation is limited to specific performance. *Id.* at 382-383 (where anticipatory repudiation has occurred, "the vendor will not be bound . . . to any performance in advance of, or other than, that to which he has agreed, or to any payment of damages in advance of a material breach of contract" [citation omitted]).

The parties agree that the Proskys anticipatorily repudiated the contract in August, 2004, when Clark informed K.G.M. that the Proskys had another buyer and that K.G.M. should calculate its damages. The issue is whether the judge correctly found that the Proskys also committed an actual breach of the implied covenant of good faith and fair dealing as a consequence of their counsel's actions at the May 20, 2005, closing, and, if so, whether the judge's remedy, allowing K.G.M. to elect between specific performance and liquidated damages, was appropriate. We agree with the judge as to both questions.

"Every contract implies good faith and fair dealing between the parties to it." *Warner Ins. Co.* v. *Commissioner of Ins.*, 406 Mass. 354, 362 n.9 (1990), quoting *Kerrigan* v. *Boston*, 361 Mass. 24, 33 (1972). "The implied covenant of good faith and fair dealing provides 'that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract . . . .' " *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 471-472 (1991), quoting *Drucker* v. *Roland Wm. Jutras Assocs.*, 370 Mass. 383, 385 (1976). "[T]he implied covenant exists so that the objectives of the contract may be realized." *Ayash* v. *Dana-Farber Cancer Inst.*, 443 Mass. 367, 385 (2005). See *Crellin Techs., Inc.* v. *Equipmentlease Corp.*, 18 F.3d 1, 10 (1st Cir. 1994).

We discern no error in the judge's decision based on the case as it was actually litigated, and the evidence admitted at trial, that Clark's actions constituted an actual breach of the implied covenant of good faith and fair dealing.[13] The facts relied on by the judge regarding the Proskys' counsel's actions at the closing

---

[13]As the judge correctly noted, the fact that the Proskys apparently did not wish to commit a breach of the contract, and that their attorney may have done so of his own accord, is irrelevant. The Proskys authorized Peter Clark

indicated that the Proskys' counsel (and therefore the Proskys themselves) had no intention of going forward with the closing, and that he and the Proskys instead intended to prevent K.G.M. from reaping "the fruits of the contract." *Anthony's Pier Four, Inc.*, 411 Mass. at 471-472.

In the period leading up to the closing, Clark could not be reached by K.G.M.'s attorneys, and did not provide K.G.M. with a purchase price or a description of the property to be transferred, information that was necessary to ensure that the closing took place as planned. Further, Clark's actions at the closing were clearly designed to torpedo it. Clark brought a videographer, for no validly explained reason, and insisted that the proceedings be recorded over the objection of K.G.M. and to the surprise of Stephen Prosky. This led to an extended and heated argument between the parties. Clark also refused to allow Sousa to handle the closing documents, instead holding them up a few feet away and essentially taunting Sousa. These actions ensured that the parties would be unable to close.

We disagree with the Proskys' contention that the closing failed only because of a disagreement over the proper interpretation of the contract language. While the parties may have disagreed over the cost, the issue could have been negotiated had Clark's actions not ensured that the matter would not be resolved. Simply put, K.G.M. could not possibly be expected to close a deal for the purchase of land without an opportunity to review the note and mortgage prepared by the Proskys.

Accordingly, we do not see any basis to conclude that the judge's findings were clearly erroneous, and we agree that the Proskys' actions "virtually guaranteed that the closing would fail." Therefore, we affirm the judge's findings that the Proskys committed both an anticipatory and an actual breach, and turn to a discussion of his proposed remedy.[14]

b. *The proposed remedy.* The Proskys argue that the judge

---

to represent them in the proceedings, and they are thus responsible for his actions. See *Link* v. *Wabash R.R.*, 370 U.S. 626, 633-634 (1962). Cf. *Ruml* v. *Ruml*, 50 Mass. App. Ct. 500, 507 (2000) (knowledge of attorney attributed to client).

[14]We find no merit in the Proskys' argument that K.G.M. committed a breach of the contract by failing to tender payment of $1,050,000. K.G.M. was only required to pay one-third of the purchase price at closing — a

erred in allowing K.G.M. to elect either specific performance or liquidated damages. In the alternative, they argue that because the complaint was never amended to seek liquidated damages, K.G.M. is foreclosed from seeking that remedy.[15]

When a purchase and sale agreement contains a provision awarding liquidated damages in the event of a breach, that provision will be enforced so long as "at the time the agreement was made, potential damages were difficult to determine and the clause was a reasonable forecast of damages expected to occur in the event of a breach." *Kelly* v. *Marx*, 428 Mass. 877, 878 (1999). However, "[i]t is settled by our decisions and by the great weight of authority that the right to specific performance either affirmatively or by way of injunction is not lost because the contract contains a provision for the payment of a penalty or liquidated damages in the event of a breach." *Rigs* v. *Sokol*, 318 Mass. 337, 342-343 (1945). See *Noyes* v. *Bragg*, 220 Mass. 106, 109 (1915) ("objection that the plaintiff had an action at law to recover damages for breach of agreement does not deprive equity of its jurisdiction to compel specific performance of the contract").

Ordinarily an aggrieved party to a contract is not entitled to both remedies. *Perroncello* v. *Donahue*, 448 Mass. 199, 204 (2007). As such, plaintiffs are commonly allowed to elect either remedy where they have been the victim of an actual breach. See *id.* (when purchaser of real property commits breach of contract for sale, seller may retain property and bring action for damages or request specific performance; "the retention of a deposit as liquidated damages is an alternative to specific performance, not an additional remedy"). See also *Connihan* v. *Thompson*, 111 Mass. 270, 271-272 (1873) (specific performance and damages for breach are "alternative remedies," and plaintiff

---

purchase price that was not determined until judgment — and nothing in the record suggests that it was not willing and able to pay. Further, any tender by K.G.M. likely would have been futile, based on the Proskys' repudiation and breach at the closing, which excused K.G.M. from any duty to tender. See *Tucker* v. *Connors*, 342 Mass. 376, 383 (1961).

[15]The Proskys' argument that K.G.M. was limited to specific performance because K.G.M. only established an anticipatory repudiation rather than an actual breach of the argument is disposed of by our affirmance of the judge's finding of an actual breach.

may be required to choose which he will pursue); *McMahan* v. *McMahon*, 122 S.C. 336, 342 (1922) ("When either party to a contract for the sale of land has failed in his obligation, the other is entitled to the alternative remedy of specific performance in equity or damages at law"). This election is particularly appropriate where, as here, K.G.M. sought specific performance under the belief that the purchase price was far less than the price eventually determined by the judge. Given that specific performance of the agreement would have cost K.G.M. almost $300,000 more than it anticipated at the start of the suit, the judge did not err in allowing K.G.M. to elect to receive liquidated damages.

The fact that K.G.M. did not amend its complaint to seek liquidated damages does not change our analysis. The issues of the anticipatory and actual breach of the agreement up through the failed closing were thoroughly litigated by the parties,[16] and the judge's decision to offer K.G.M. its choice of remedy was well within the scope of the litigation. While the preferred course of conduct would have been for K.G.M. to seek amendment of its complaint to conform to the evidence regarding the actions evidencing breach occurring subsequent to the filing of its suit for specific performance, and to specifically seek liquidated damages under the agreement, it was not required to do so. See Mass R. Civ. P. 15 (b), 365 Mass. 761 (1974) ("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence . . . may be made . . . but failure so to amend does not affect the result of the trial of these issues").[17] See also *Collins* v. *Snow*, 218 Mass. 542, 545 (1914) (where no amend-

---

[16]A letter from Sousa to Clark, detailing the events of the closing as described above, was admitted in evidence at trial. Additionally, Sousa, Stephen Prosky, and Mills all testified as to what occurred at the closing.

[17]Had the Proskys objected at trial to the admission of evidence regarding the postfiling breach of the agreement, and K.G.M.'s claim for liquidated damages, the judge could have allowed the pleadings to be amended. Mass. R. Civ. P. 15 (b), 365 Mass. 761 (1974). However, not only was the evidence of such a breach never objected to, but the Proskys took the position at trial that K.G.M. was *only* entitled to liquidated damages, and not specific performance.

ment made to original bill, plaintiff given leave to amend to reflect evidence introduced after filing of original bill).

Simply put, where the issue was fully litigated, the Proskys could not have been surprised by the judge's decision, and thus they were not prejudiced by K.G.M.'s failure to amend the complaint. Therefore, we hold that the judge's resolution was not in error.

c. *Attorney's fees.* The Proskys also claim that the judge erred in awarding K.G.M. $120,000 in attorney's fees incurred in connection with the litigation of this matter. The judge found that the fees were provided for under the liquidated damages provision of the agreement. We disagree with the judge, and therefore reverse his decision.

"Our traditional and usual approach to the award of attorney's fees for litigation has been to follow the 'American Rule': in the absence of statute, or court rule, we do not allow successful litigants to recover their attorney's fees and expenses." *John T. Callahan & Sons, Inc.* v. *Worcester Ins. Co.*, 453 Mass. 447, 449 (2009). There is no statute or court rule that would provide for the awarding of attorney's fees in this case. The parties, however, may construct their agreement to provide for the payment of attorney's fees through clear and unambiguous language. *Bournewood Hosp., Inc.* v. *Massachusetts Comm'n Against Discrimination*, 371 Mass. 303, 312 (1976). See *Penney* v. *First Nat'l Bank*, 385 Mass. 715, 723 (1982) (attorney's fees incurred in enforcing note recoverable when underlying note called for such recovery).

The relevant portion of the agreement states that, in the event of a breach by the Proskys, "the [Proskys] shall pay [K.G.M.], as liquidated damages, a sum of money equal to all charges and fees paid by [K.G.M.] in connection with this transaction, including but not limited to, attorney's fees." The language of this provision is ambiguous, at best, as to the recovery of fees incurred in the course of litigating a breach of the agreement.

On its face, the clause appears to contemplate only attorney's fees incurred in connection with the transfer of the land, which would include the process of securing approval from the necessary authorities. Tellingly, the provision benefits only K.G.M., as there is no provision providing for the recovery of attorney's

fees connected with any litigation for a breach by K.G.M. Thus, where the plain language of the agreement does not contemplate the awarding of attorney's fees for litigating its breach, the judge's decision represented a windfall for K.G.M., which goes against the intent of the American Rule. *Hermanson* v. *Szafarowicz,* 457 Mass. 39, 51 (2010).[18]

For the above reasons, we affirm the trial judge's findings and decision, with the exception of its award of $120,000 in attorney's fees to K.G.M.

*So ordered.*

---

[18]It would be incongruous to award attorney's fees under a liquidated damages provision for fees incurred in litigation following the plaintiff's rejection of liquidated damages.