NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-214

CHARLES ZAMMUTO

vs.

PAUL DAMIANIDIS, trustee,[1] & another.[2]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The plaintiff, Charles Zammuto, appeals from a judgment of the Superior Court dismissing his complaint against the defendants, Paul Damianidis as trustee of EKG Realty Trust and Irene Damianidis as trustee of I & P Realty Trust, as well as from an order denying his motion to enforce a settlement agreement against the defendants.  We reverse the order denying the motion to enforce, vacate the judgment, and remand for entry of a new judgment.[3]

---

[1] Of EKG Realty Trust.

[2] Irene Damianidis, as trustee of I & P Realty Trust.

[3] In light of our disposition, we do not reach the merits of the plaintiff's appeal from the judgment on the underlying complaint.

Background.  We briefly summarize the relevant facts from the parties' agreed statement of facts for trial and the joint trial exhibits, reserving certain details for later discussion.

The defendants collectively own two next-door properties in Ashland.  The present dispute stems from a mistaken belief by the parties that the defendants also owned the approximately twelve-foot wide strip of land (strip) adjoining those properties.

In May 2019, the plaintiff made an offer to purchase the properties together, contingent on his timely obtaining the local and State permitting necessary to build a twelve- to sixteen-unit apartment building on the land.  The defendants were aware that the plaintiff intended that the building would span the properties contiguously.  The plaintiff and defendants executed a purchase and sale agreement (P&S) by the end of June 2019, and the plaintiff paid a $35,000 deposit.  The plaintiff incurred costs in applying for special permits to the town planning board and engaging professional services to prepare the building plans and test the properties for hazardous waste.  The plaintiff obtained special permits on May 6, 2020.  The permits were initially valid for two years, but were later extended by executive order and did not lapse until June 15, 2023.

Around July 2020, prior to the closing, an attorney and title insurance agent for the plaintiff's bank notified the

parties that the title to the strip was defective.  The parties determined that an adverse possession claim was the best option for the defendants to recover ownership of the strip, but doing so would cost over $3,000 and would take months to complete.  The defendants rejected the plaintiff's offer to share the costs to cure title to the strip.  Instead, they elected to terminate the P&S by invoking provisions purportedly allowing them to do so in case they were unable to deliver possession with clear title within thirty days of the time for performance or without expending more than $3,000 to cure any defect in title.

On September 25, 2020, the plaintiff filed a complaint in the Superior Court seeking specific performance of the P&S, damages for "misrepresentation, detrimental reliance, [and] restitution," and damages under G. L. c. 93A, §§ 2, 11.  The defendants filed a counterclaim for breach of contract, alleging that the plaintiff wrongfully refused to close on the purchase of the properties without title to the strip and seeking forfeiture of the plaintiff's deposit.[4]

In July 2021, the defendants obtained title to the strip through an action in the Land Court.  In the fall of 2021, the defendants approached Carlos Hanzi, the manager of Evolution

_____

[4] On March 15, 2021, a different judge granted the plaintiff a preliminary injunction ordering the defendants to release the deposit.

3

Developments, LLC (Evolution), about purchasing the combined properties, including the strip.

The defendants, the plaintiff, and Hanzi negotiated a settlement agreement in November 2021 whereby Evolution would purchase the properties from the defendants and have the special permits from the plaintiff transferred to Evolution, and at the time of closing, the plaintiff would be "paid $100,000.00 by the closing attorney as a sellers' expense" and the defendants and plaintiff would dismiss their claims in the underlying litigation.  The plaintiff and the defendants signed the settlement agreement; however, before Hanzi signed the settlement agreement, the defendants notified Hanzi and the plaintiff that they were withdrawing from the sale to Evolution.

The parties' joint pretrial memorandum filed in February 2022 and subsequent representations at the final pretrial conference on January 9, 2024, clarified that the plaintiff had abandoned his claims for specific performance of the P&S and violation of G. L. c. 93A and that the defendants had abandoned their counterclaim.  The only remaining claim in the complaint was for "misrepresentation, detrimental reliance, [and] restitution," for which the plaintiff sought $87,591.51 in damages.  On the same day that the final pretrial conference was held, the plaintiff filed a motion to enforce the settlement agreement (motion to enforce).  On January 16, 2024, the judge

4

heard the motion to enforce and conducted a bench trial on the plaintiff's misrepresentation claim.

On February 20, 2024, the judge issued an order that the plaintiff's motion to enforce was moot. On November 8, 2024, the judge issued a written decision finding that the plaintiff had not met his burden on his misrepresentation claim. Judgment dismissing the complaint on the merits entered on November 12, 2024.

Discussion. Where a settlement agreement has been reached while litigation is pending, a trial court judge has the authority to informally resolve contract claims stemming from that agreement when they are advanced by motion. See Duff v. McKay, 89 Mass. App. Ct. 538, 541-542 (2016). "A settlement agreement is a contract and its enforceability is determined by applying general contract law" (citation omitted). Dacey v. Burgess, 491 Mass. 311, 318 (2023). Interpretation of the terms of a settlement agreement, like those of any contract, is a question of law that we review de novo. See, e.g., USM Corp. v. Arthur D. Little Sys., Inc., 28 Mass. App. Ct. 108, 116 (1989).

Given the proximity to trial of the plaintiff's filing the motion to enforce and the lack of an evidentiary hearing, we "treat[] [the motion] as akin to one for summary judgment," and thus we review the denial of the motion "de novo, to determine whether, viewing the evidence in the light most favorable to the

5

nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law" (quotation and citation omitted). Duff, 89 Mass. App. Ct. at 542-543.

Here, the plaintiff alleged in the motion to enforce that the defendants were in breach of the settlement agreement. As a remedy, the plaintiff sought a judgment of $100,000 against the defendants and an order dismissing the plaintiff and defendants' claims with prejudice.[5]

The judge found that the settlement agreement was a binding contract on the parties. Although the judge found that the defendants essentially committed a breach of the settlement agreement, he denied the motion to enforce as "moot" based on "the contingent nature of the settlement agreement" and "the passage of time." Accordingly, the judge did not reach the issue of the plaintiff's remedy. We discuss these points in turn.

1. <u>Existence of contract</u>. We conclude that the evidence supported the judge's conclusion that the settlement agreement was binding on the parties.

---

[5] At the motion hearing, the plaintiff clarified that he was no longer seeking dismissal of the defendants' counterclaim because the defendants had abandoned it.

6

A binding agreement requires that "the parties manifested the intent, viewed objectively, to be bound at the time of contract formation, notwithstanding [any] party's subjective intent." Brewster Wallcovering Co. v. Blue Mountain Wallcoverings, Inc., 68 Mass. App. Ct. 582, 596 n.35 (2007). The defendants argue that although they and the plaintiff signed the settlement agreement, the agreement did not become binding because Hanzi never signed it or indicated when he would. We disagree.

E-mail correspondence between counsel for the three parties to the settlement agreement demonstrates that the agreement was actively negotiated in early November 2021. After defense counsel circulated a draft on November 11, 2021, plaintiff's counsel responded that the agreement "look[ed] fine" besides needing to incorporate a promise by the defendants to dismiss their counterclaim -- a term which the final agreement added. On November 12, 2021, Hanzi's attorney approved the terms of the negotiated settlement agreement in an e-mail message stating, "Looks good -- thanks."

On November 16, 2021, the defendants signed the settlement agreement and sent an e-mail message notifying the plaintiff and Hanzi and inquiring about their preferred method for execution. Plaintiff's counsel stated that, regardless of how the document was executed, "[The plaintiff] can sign either way." The next

7

day, defense counsel mailed the original agreement to the office

of Hanzi's attorney, who received the document on November 18

and wrote to the plaintiff and defendants inviting the plaintiff

to come to his office to sign in person.  The plaintiff

ultimately signed the settlement agreement in person at Hanzi's

office on the morning of November 23.[6]  Later that morning,

Hanzi's attorney sent an e-mail message to the defendants'

attorney demonstrating that he had already begun preparing the

application for transfer of the site plan approval as

contemplated by item 2 of the settlement agreement.

From these facts, it is clear that negotiations of the

settlement agreement had been perfected,[7] as the plaintiff,

defendants, and Hanzi had each assented to the settlement

agreement's final terms.  No party to the settlement agreement

suggested that it would not be bound until the formal settlement

agreement was executed, and the defendants readily executed it.

See Duff, 89 Mass. App. Ct. at 546.  The plaintiff and Hanzi

approached the act of signing as a formality without

equivocation.  Accord Fecteau Benefits Group, Inc. v. Knox, 72

---

[6] This fact, while apparently disputed in the trial court, is conceded in the defendants' appellate brief.  It is not material to our analysis.

[7] This determination is not affected by the apparent factual dispute over whether the purchase and sale agreement between the defendants and Evolution was still actively being negotiated.

Mass. App. Ct. 204, 213 (2008) (no error in finding intent to be bound where e-mail exchange included all material terms of agreement, deadline for acceptance, and acceptance without equivocation). Viewed objectively, the statements and conduct of the parties to the settlement agreement manifested their contemporaneous intent to be bound such that a contract had been formed at latest by the morning of November 23. See Novel Iron Works, Inc. v. Wexler Constr. Co., 26 Mass. App. Ct. 401, 410 (1988) (concluding draft agreement was binding notwithstanding lack of signatures where "[t]he preliminaries had been completed, the essential terms of the agreement had been reached, and the parties thereafter engaged in activities consistent with their agreement").

2. Conditions precedent to enforceability. The judge found that the motion to enforce was "moot" in part because the agreement was "contingent upon four . . . other steps occurring." The judge did not specify whether he meant that the conditions were precedent to contract formation or to performance. See Twin Fires Inv., LLC v. Morgan Stanley Dean Witter & Co., 445 Mass. 411, 420-421 (2005). The parties agree that the conditions contained in items 1 through 4 of the settlement agreement preceded at least the obligations to perform set forth in items 5 to 6, to wit, the defendants'

obligation to pay the plaintiff $100,000[8] and the plaintiff and defendants' mutual obligation to dismiss and release all their claims in the underlying litigation.  However, the defendants further press the argument that the nonoccurrence of the conditions foreclosed contract formation.  The crux of their argument is that the settlement agreement was a "framework" that would only take legal effect if the defendants closed on the sale with Evolution, while leaving the defendants free to disengage from the closing if it was not beneficial to them.

We agree with the plaintiff's position that the conditions in the settlement agreement are not precedent to its effectiveness and that the agreement imposed on the defendants a duty to attempt to close with Evolution in good faith.

"Contract conditions precedent generally are of two kinds." Haverhill v. George Brox, Inc., 47 Mass. App. Ct. 717, 719 (1999).  "The first involves issues of offer and acceptance which precede and determine the formation of a contract. . . . The second arises from the terms of a valid contract and defines an event which must occur before a right or obligation matures under the contract."  Id.  Conditions precedent may be created

_____

[8] Although the judge interpreted the settlement agreement to mean that Hanzi would pay $100,000 to the plaintiff, we conclude that the agreement unambiguously obligated the defendants to make that payment.  The settlement agreement describes the payment as a "sellers' expense," not a buyer's expense.

10

through "emphatic words" or through an intent manifested by the contract as a whole.  Massachusetts Mun. Wholesale Elec. Co. v. Danvers, 411 Mass. 39, 46 (1991).

Here, the defendants' proposed reading of the conditions as precedent to the effectiveness of the settlement agreement is unreasonable for two reasons.  First, although the emphatic conditional language in items 5 and 7, set out in full in the margin,[9] pertains in part to offer and acceptance, it implicates the purchase and sale agreement between the defendants and Evolution, not the settlement agreement itself.  Cf. Haverhill, 47 Mass. App. Ct. at 719.  Instead, item 5 is more naturally read to define events -- the satisfactory completion of items 1 through 4 -- which must occur before the plaintiff and defendants' core obligations mature under items 5 and 6 of the contract.

---

[9] Those provisions of the settlement agreement follow:

"5.  In the event that items 1-4 above are satisfactorily completed, then at closing between [the defendants] and Evolution, [the plaintiff] will be paid $100,000.00 by the closing attorney as a sellers' expense;

"6.  In exchange for the $100,000.00 check, [the plaintiff and the defendants] will sign and exchange a signed Stipulation of Dismissal with prejudice of all claims and counterclaims in the lawsuit for filing in the Middlesex Superior Court, together with mutual releases;

"7.  In the event that Evolution does not close on the property, this [a]greement shall be null and void."

11

Second, although we grant the defendants that item 1 --

agreeing that the defendants "are authorized to accept the

Evolution offer" -- does not appear to impose a requirement to

close when read in isolation, our interpretation is informed by

the structure and surrounding provisions of the contract.  See

Charles I. Hosmer, Inc. v. Commonwealth, 302 Mass. 495, 501

(1939) ("The literal interpretation of any word or phrase may be

qualified by the context in which it appears, [and] by the

general purpose manifested by the entire contract").

Items 2 through 4 set forth actionable tasks incumbent on

the plaintiff and that were prerequisites to closing:  to

cooperate with Evolution in securing town board approvals for

permit transfers to Evolution, to assign certain rights to

Evolution, and to indemnify Evolution and the defendants against

certain claims.  Meanwhile, item 5 treats the preceding four

items as tasks to be "satisfactorily completed" prior to the

time of the parties' core performance at closing.  Item 7 of the

agreement provides that "[i]n the event that Evolution does not

close on the property, this [a]greement shall be null and void."

This emphatic provision for ineffectiveness applies only to

Evolution's failure to close,[10] and there is no comparable

_____

[10] In contrast, the event triggering payment to the
plaintiff is the "closing between [the defendants] and
Evolution" (emphasis added).  We presume that this distinction
is deliberate.  See J.A. Sullivan Corp. v. Commonwealth, 397

12

language to void the agreement in the event that the defendants thwarted the closing.  Nor is there any language to void the agreement in the event that the plaintiff failed to take the actions set forth in items 2 through 4.

To harmonize these provisions, we construe the agreement as charging the defendants with the pursuit of closing in parallel with the plaintiff's duties established in items 2 through 4. Accordingly, we agree with the plaintiff's contention that the agreement contemplates that the defendants were required to make a good faith attempt to close with Evolution.  See Weiler v. PortfolioScope, Inc., 469 Mass. 75, 82 (2014) (every contract contains implied covenant of good faith and fair dealing).  See also Goren v. Royal Invs. Inc., 25 Mass. App. Ct. 137, 139 (1987) (parties' obligation to exercise good faith in attempting to draft and negotiate formal purchase and sale agreement was implicit in provision of preliminary agreement looking to execution of agreement).

3.  Breach of contract.  Notwithstanding the conditional nature of the defendants' core obligations under items 5 and 6, we agree with the plaintiff that the judge erred by determining that the nonoccurrence of the conditions precedent rendered the defendants' obligation to perform unenforceable.  "A repudiation

_____

Mass. 789, 795 (1986) ("[E]very phrase and clause must be presumed to have been designedly employed" [citation omitted]).

13

of a contract is a material breach" and when it is "with respect to the entire performance that was promised or with respect to so material a part of it as to go to the essence," the repudiation "operate[s] as a discharge of the other party" (citation omitted). Coviello v. Richardson, 76 Mass. App. Ct. 603, 609 (2010). Furthermore, "it is fundamental that a promisor may not avoid his promised performance based on the nonoccurrence of a condition, where the promisor has himself hindered or prevented its occurrence." Lobosco v. Donovan, 30 Mass. App. Ct. 53, 56 (1991). See Restatement (Second) of Contracts § 245 (1981).

The November 23, 2021 e-mail message from the defendants' attorney informed the plaintiff and Hanzi that the defendants would not enter into a purchase and sale agreement with Evolution and would not negotiate further. This was a definite and unequivocal manifestation of the defendants' intention not to perform any of its obligations under the settlement agreement; it consequently served to repudiate the settlement agreement and excuse the plaintiff from any further performance. See Coviello, 76 Mass. App. Ct. at 609. The defendants waived nonoccurrence of the conditions precedent as a defense to their own failure to perform, having precluded the occurrence of the same by their repudiation. See Lobosco, 30 Mass. App. Ct. at 56.

14

We conclude that the defendants' obligation to pay the plaintiff $100,000 is enforceable even though the conditions precedent to that obligation were not fulfilled, and that the defendants committed a breach of that obligation.

4. _Timeliness_. As a second ground for denying the motion to enforce as "moot," the judge cited his concern that the plaintiff had waited over two years after the defendants' breach to file his motion to enforce. The judge stated that the special permits had lapsed in May 2022 and found that "imposing a remedy of specific performance at this juncture is futile, at best, and further was not requested as the relief sought by the [p]laintiff" (footnote omitted). We agree with the plaintiff that this was error.

The judge's finding appears to be made in response to the defendants' reliance on the equitable defense of laches in their opposition to the motion to enforce and at the motion hearing. We therefore ground our analysis of the finding in that doctrine. "A judge may find as a fact that laches exists if there has been unjustified, unreasonable, and prejudicial delay in raising a claim." _Srebnick_ v. _Lo-Law Transit Mgt., Inc_., 29 Mass. App. Ct. 45, 49 (1990).

15

Assuming arguendo that laches is an available defense to enforcement of the settlement agreement,[11] the plaintiff's argument exposes two errors in the judge's finding.  First, under our interpretation of the settlement agreement, the record does not support a finding that the plaintiff's delay in bringing the motion to enforce was unreasonable.  Whereas the judge explained that "[i]t is undisputed that the permit obtained by the [p]laintiff lapsed in May 2022," the parties' agreed statement of facts for trial states that the special permits were extended by executive order until June 15, 2023.  Because the settlement agreement did not contemplate a date for the closing, it is conceivable that the time for the defendants' performance under items 5 and 6 would not have arrived until June 15, 2023, when the special permits, if "substantial use [of them had not yet] commenced," would have lapsed.  In these circumstances, and where the date for performance of the settlement agreement depended on the outcome of negotiations of the purchase and sale agreement between the defendants and Evolution, we interpret the settlement agreement to impose June 15, 2023, as a "reasonable" deadline for performance.  See Dalrymple v. Winthrop, 97 Mass. App. Ct. 547, 555 (2020).

---

[11] Laches generally is not a bar to recover money damages for breach of contract.  See Bedford Heating & Air Conditioning Co. v. Milano, 6 Mass. App. Ct. 898, 898 (1978).

16

Because "Massachusetts has not generally recognized the doctrine of anticipatory repudiation," we agree with the plaintiff that he would not have been able to bring a claim for breach of contract at law until the special permits expired (citation omitted).  K.G.M. Custom Homes, Inc. v. Prosky, 468 Mass. 247, 253 (2014).  Although limited exceptions have been made to that rule for some equitable causes of action, see Cavanagh v. Cavanagh, 33 Mass. App. Ct. 240, 243 (1992), in consideration of the defendants' repudiation, we also agree with the plaintiff that he was not obligated to bring a claim for specific performance or injunctive relief prior to the lapse of the special permits.  See Blakeley v. Pilgrim Packing Co., 4 Mass. App. Ct. 19, 24 (1976) ("[O]ne, who openly defies known rights, in the absence of anything to mislead him or to indicate assent or abandonment of intent to oppose on the part of others, is not in a position to urge as a bar failure to take the most instant conceivable resort to the courts" [citation omitted]).

Second, as we interpret the settlement agreement, the plaintiff's delay in bringing the motion to enforce did not prejudice the defendants.  Contrary to the judge's finding that enforcement would be "futile," the plaintiff correctly points out that both of the parties still "have a stake in the claim." Indeed, the relief the plaintiff sought through the motion to enforce was the specific benefit of the settlement bargain:  a

17

judgment against the defendants enforcing their obligation to pay him $100,000[12] and enforcing the plaintiff and defendants' promises to dismiss with prejudice their claims in the underlying litigation. The lapse of the special permits did not prejudice the defendants' position in the enforcement of the settlement agreement because the defendants had no rights to the permits and the agreement contemplated only that the plaintiff would "cooperate with Evolution . . . to get all approvals by and from the appropriate Town of Ashland boards or committees needed in order to transfer all [p]ermits to Evolution" (emphasis added). Hanzi, as a nonbreaching third party to the settlement agreement, could not be compelled to perform. After the defendant's repudiation caused Hanzi to lose interest in the deal, the defendants never stood to benefit from the plaintiff's special permits under the settlement agreement. Because the record does not support any finding that the plaintiff's delay in bringing the motion to enforce was unreasonable or prejudicial, we conclude that there was no equitable basis for denying the plaintiff's motion. This is therefore a live controversy, and the plaintiff's motion to enforce the settlement agreement was not moot.

---

[12] Paragraph 5 of the settlement agreement represented payment to the plaintiff to reimburse him for his prior expenses, which are also the subject of his claim for misrepresentation.

18

5. Recovery for breach. "The long-established general rule for breach of contract recovery . . . is that the wronged party should receive the benefit of his bargain, i.e. be placed in the same position as if the contract had been performed." VMark Software, Inc. v. EMC Corp., 37 Mass. App. Ct. 610, 611 n.2 (1994). Here, the plaintiff is entitled to $100,000, the amount that he would have received if the settlement agreement had been performed.

Conclusion. We conclude that there was no genuine dispute of fact material to the motion to enforce and that, taking the undisputed facts in the light most favorable to the defendants, the plaintiff was entitled as a matter of law to a favorable judgment on the motion. See Duff, 89 Mass. App. Ct. at 542.

If the motion to enforce had been properly allowed, the trial would have been avoided and the complaint dismissed but not on the merits. Accordingly, we reverse the order denying the plaintiff's motion to enforce the settlement agreement, and a new order shall enter allowing the motion. We vacate the judgment of dismissal on the merits, and we remand for entry of a new judgment ordering the defendants to provide $100,000 to

the plaintiff and dismissing with prejudice the plaintiff's complaint and the defendants' counterclaim.[13]

So ordered.

By the Court (Singh, Grant & Tan, JJ.[14]),

*[signature: Paul Little]*

Clerk

Entered:  June 11, 2026.

---

[13] The defendants' request for attorney's fees is denied.

[14] The panelists are listed in order of seniority.