NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11476


   MILTON C. WEILER, JR.  vs.  PORTFOLIOSCOPE, INC., & others.[1]



        Suffolk.      March 3, 2014. - July 11, 2014.

  Present:  Ireland, C.J., Spina, Cordy, Botsford, Gants, Duffly,
                    & Lenk, JJ.



Secured Transactions.  Uniform Commercial Code, Secured
     creditor, Secured transaction, Good faith.  Corporation,
     Stock.  Contract, Performance and breach, Implied covenant
     of good faith and fair dealing, Interference with
     contractual relations.  Conversion.  Consumer Protection
     Act, Unfair or deceptive act.  Uniform Fraudulent Transfer
     Act.




     Civil action commenced in the Superior Court Department on
February 17, 2009.

     The case was heard by Margaret R. Hinkle, J.

     After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.


     Curtis C. Pfunder for the plaintiff.
     Andrew N. Nathanson (Keith P. Carroll with him) for the
defendants.


─────────────────

     [1] Kevin B. Kimberlin and Joseph T. Whelihan.

BOTSFORD, J.  The disputes in this case arise from a complex web of relationships between various individual and corporate entities.  The plaintiff, Milton C. Weiler, Jr., the former president and chief operating officer of the defendant corporation, PortfolioScope, Inc. (PortfolioScope), brought suit against the defendants raising various claims, including breach of contract, violation of G. L. c. 93A, and fraudulent transfers pursuant to the Uniform Fraudulent Transfer Act (UFTA).  After a jury-waived trial, Weiler prevailed, and a judgment entered in his favor.  The Appeals Court reversed the judgment in part, and we granted Weiler's application for further appellate review.  For the reasons discussed hereafter, we affirm the judgment of the Superior Court in almost all respects.

1.  Background.  We summarize the pertinent facts as found by the trial judge; additional facts are discussed in connection with the issues raised.  In 1981 and 1998, respectively, Weiler cofounded Computer Aided Decisions and CAD Research, Inc. (CAD entities), companies that developed and marketed software to help manage investment portfolios.  In early 2000, Spencer Trask & Co. (Spencer Trask), a venture capital firm effectively controlled by the defendant Kevin Kimberlin,[2] acquired the CAD

---

[2] Kevin Kimberlin owns approximately ninety-five per cent of Spencer Trask & Co. (Spencer Trask).  The principal beneficiaries of Spencer Trask are trusts and partnerships in the names of Kimberlin's wife and children.  Kimberlin served as

entities from Weiler and the cofounder. After the purchase, the CAD entities were merged into a new company that became the defendant PortfolioScope. Weiler received cash as well as stock and stock options in the new company at the time of the sale and served at that time as its president and chief operating officer.

In 2001, PortfolioScope began experiencing financial difficulty, and it received a series of loans from Wachovia Bank, N.A. (Wachovia), beginning on February 20, 2001.[3] Kevin Kimberlin Partners, L.P. (KKP), guaranteed these Wachovia loans, and in that connection, on February 20, 2001, PortfolioScope executed a security agreement granting KKP a security interest in all of PortfolioScope's property, including its deposit accounts and cash. On July 25, 2001, PortfolioScope executed a demand note in favor of Wachovia in the amount of $4.01 million.[4] On July 10, 2002, KKP paid off PortfolioScope's debt to Wachovia, and thereafter received an assignment of all of Wachovia's rights and interests in PortfolioScope. The

---

the chairman of the board and the sole director of Spencer Trask.

[3] The initial loan from Wachovia Bank, N.A. (Wachovia), to PortfolioScope was for $3.01 million.

[4] All of the loans Wachovia made to PortfolioScope were covered by the February 20, 2001, security agreement between Kevin Kimberlin Partners, L.P. (KKP), and PortfolioScope.

assignment agreement incorporated the security agreement that PortfolioScope previously had executed in favor of KKP.  Between 2003 and 2008, PortfolioScope received additional loans from KKP directly.[5]

Weiler served as PortfolioScope's president and chief operating officer from January, 2000, to May, 2002.  Kimberlin hired the defendant, Joseph T. Whelihan, in January, 2002, to become PortfolioScope's chief executive officer.  On February 13, 2002, Weiler entered into a stock option purchase and sale agreement with PortfolioScope (five per cent agreement), in which Weiler agreed to sell back to PortfolioScope 666,667 vested and unvested stock options in the company, and in exchange would be paid a contingent purchase price.  On October 21, 2002, the parties amended the five per cent agreement (five per cent amendment) to include a provision that PortfolioScope would pay Weiler five per cent of the net proceeds received in connection with a pending lawsuit between PortfolioScope and iFlex Solutions Limited (iFlex litigation).[6]  Whelihan, as

---

[5] These loans were made between October 1, 2003, and October 9, 2008, totaled $1.272 million, and were evidenced by senior secured promissory notes executed by PortfolioScope.

[6] The amendment to the five per cent agreement (five per cent amendment) provides in pertinent part that, "[i]n addition to payments to be made by the Company as described in the [five per cent agreement]," PortfolioScope would pay Weiler:

Portfolioscope's chief executive officer, signed both the five per cent agreement and the five per cent amendment on behalf of the company; the five per cent agreement also was initialed by Kimberlin.

Between May, 2002, and October 21, 2008, Weiler consulted with PortfolioScope, principally in connection with the then pending iFlex litigation.[7]  On October 21, 2008, the iFlex litigation settled for $10 million.  The law firm serving as PortfolioScope's counsel in that litigation received the $10 million settlement funds on November 7, and, after deducting the amount claimed by the firm as legal fees, transferred approximately $8.2 million to PortfolioScope on November 12. That same day, Kimberlin directed Whelihan to wire $5.2 million of the proceeds to a Spencer Trask brokerage account because he wanted to gain immediate access to the settlement proceeds.  On

---

"Five (5) percent of the net proceeds (or net recovery) to the Company [PortfolioScope] in connection with any claims by the Company against Citicorp (and its affiliates) related to copyright infringement and/or theft of confidential information and trade secrets.  The term net proceeds or net recovery as used in this Section shall mean gross proceeds less legal fees of the Company's counsel."

The parties do not dispute that the litigation with iFlex Solutions Limited (iFlex litigation) is covered by the five per cent amendment.

[7] Weiler and PortfolioScope also entered into various consulting agreements between 2002 and 2008, of which the trial judge found PortfolioScope had committed a breach.

November 17, again at Kimberlin's direction, Whelihan wired another $1.296 million to the Spencer Trask account and, separately, another $1,231,186.13, also to Spencer Trask.[8] Also on November 17, at Kimberlin's direction, Whelihan wired $500,000 to an account in Whelihan's wife's name. Finally, on November 25, Whelihan paid himself $15,000 from the iFlex litigation settlement proceeds, a transaction authorized by Kimberlin.[9] Taken together, these transfers accounted for almost all of the iFlex litigation settlement proceeds.[10]

After the iFlex litigation settled, beginning on November 10, 2008, Weiler initiated a series of "increasingly frustrated" inquiries directed at Whelihan, Kimberlin, and others connected to PortfolioScope and Spencer Trask as to when he was to be paid his entitlement under the five per cent amendment. On December 2, 2008 -- after the iFlex litigation proceeds were essentially depleted -- Whelihan sent a message via electronic mail (e-mail) to Weiler, with a copy to

---

[8] This second transfer on November 17, 2008, appears to have been intended to satisfy an escrow order entered by a Superior Court judge in a then-pending lawsuit between PortfolioScope and Charles Hunt, Weiler's former business partner.

[9] For ease of reference, we refer to the transfer to Whelihan's wife and the transfer to Whelihan collectively as transfers to Whelihan.

[10] After these transfers, approximately $36,000 remained from the iFlex litigation settlement funds.

Kimberlin, asking whether Weiler would settle for an amount less than that he was otherwise entitled to under the five per cent amendment. On December 4, Weiler responded that he would accept $406,000 as payment in full. When no transfer of funds was made, Weiler sent an e-mail to Whelihan on December 8, asking when he should expect payment; Whelihan asked Weiler to "hold on a little longer." Weiler made a subsequent inquiry on December 17, to which Whelihan indicated that Weiler was "[his] first priority tomorrow. Promise."[11] Weiler never received payment from PortfolioScope.

On March 23, 2009, Whelihan sent an e-mail to Weiler informing him that he was sending Weiler a $20,000 check as part of an instalment plan as an incentive to help with the pending litigation between PortfolioScope and Charles Hunt.[12] See note 8, supra. Shortly thereafter, Weiler served his complaint in this action, alleging various claims against PortfolioScope, Whelihan, and Kimberlin (collectively, defendants).[13] Only after

---

[11] The trial judge found that "[a]t this point . . . Whelihan was simply stringing Weiler along."

[12] Weiler subsequently received and cashed the $20,000 check.

[13] Weiler asserted the following claims in his amended complaint: (1) breach of contract against PortfolioScope; (2) breach of the implied covenant of good faith and fair dealing against PortfolioScope; (3) tortious interference with contractual relations against Kimberlin; (4) violation of G. L. c. 93A, § 11, against PortfolioScope, Whelihan, and Kimberlin

the lawsuit was filed did Weiler learn that: (1) Whelihan had transferred $515,000 to himself; and (2) the defendants were asserting that Weiler was not being paid because KKP was a secured creditor of PortfolioScope and had a priority interest in the settlement proceeds that trumped Weiler's contractual rights.

After a bench trial, the judge issued a written decision in which she made detailed findings and concluded that: (1) PortfolioScope committed a breach of the five per cent amendment and the consulting agreements with Weiler as well as the covenant of good faith and fair dealing;[14] (2) Kimberlin tortiously interfered with Weiler's contractual rights vis-à-vis Portfolioscope; (3) the defendants converted funds belonging to Weiler; (4) the defendants knowingly and wilfully engaged in unfair or deceptive acts or practices in violation of G. L. c. 93A, § 11; (5) the defendants violated UFTA; and (6) the

_____

(collectively, defendants); (5) fraudulent transfers in violation of the Uniform Fraudulent Transfer Act (UFTA) against the defendants; (6) misrepresentation against the defendants; (7) violation of the Massachusetts Wage Act against the defendants; (8) quantum meruit, unjust enrichment, and equitable estoppel against the defendants; (9) detrimental reliance against Kimberlin and Whelihan; (10) conversion against the defendants; (11) civil conspiracy against the defendants; (12) piercing the corporate veil against Kimberlin; and (13) a claim for an accounting against the defendants.

[14] The defendants do not challenge the judge's finding of breach of contract (the five per cent amendment or the consulting agreements) against Portfolio, or the judgment of $471,122.97 on this count.

defendants conspired against Weiler.[15]  The defendants appealed
to the Appeals Court, which affirmed the judgment against
Portfolioscope for breach of contract, but otherwise reversed,
concluding that judgment should enter in favor of the defendants
on all other counts in Weiler's amended complaint.  Weiler v.
PortfolioScope, Inc., 83 Mass. App. Ct. 216, 233 (2013).  We
affirm the judgment of the Superior Court with the exception of
Weiler's claim for conversion.

2.  Discussion.  The defendants argue that the judge erred
in certain fundamental respects in her interpretation of the
five per cent agreement and five per cent amendment, as well as
in her analysis of secured transaction principles as applied to
this case; in the defendants' view, these errors infected almost
every part of the disposition of the case.  As to the five per
cent agreement and amendment, the defendants contend that the
judge misinterpreted the five per cent amendment as giving
Weiler a right to five per cent of the actual settlement
proceeds of the iFlex litigation (less legal fees), rather than
a right to five per cent of the value of the settlement (less
legal fees).  With respect to secured transaction principles,

---

[15] Judgment entered awarding damages against the defendants,
jointly and severally where applicable, with respect to each
count of the amended complaint on which one or more of the
defendants were found liable, including double damages and
attorney's fees in connection with the violation of G. L.
c. 93A, and additional remedies in connection with the violation
of UFTA.

the defendants contend that the judge failed to accord proper legal significance to the fact that the $515,000 in transfers from the iFlex litigation settlement proceeds to Whelihan and the approximately $6.5 million in transfers from the proceeds to Spencer Trask in substance and legal effect were transfers to PortfolioScope's secured creditor, KKP, an entity that as a matter of law had priority over Weiler.[16]  The Appeals Court agreed with the defendants.  See Weiler, 83 Mass. App. Ct. at 218, 223-226.  We also agree that the five per cent amendment did not give Weiler a right to recover from the actual settlement proceeds, but in the factual circumstances of this case, conclude that any error in the judge's interpretation of the five per cent amendment affects only Weiler's claim for conversion.  On the law of secured transactions, the judge's factual findings in this case persuade us that no legal error

---

[16] There is a question whether KKP's February 20, 2001, security agreement actually covered the iFlex litigation settlement proceeds.  To have a security interest in commercial tort claims, they must be named expressly in the security agreement and must be in existence at the time the security agreement is created.  See G. L. c. 106, § 9-108 (e) (1) (description by type insufficient for commercial tort claims); G. L. c. 106, § 9-204 (b) (2) (after-acquired property clause ineffective against commercial tort claims).  At all relevant times in this case, however, the iFlex litigation settlement had been reduced to cash and placed in PortfolioScope's account, and KKP had a security interest in PortfolioScope's cash and deposit accounts.  For the purposes of our discussion, we assume, without deciding, that KKP's security interest in PortfolioScope's assets extended to the settlement proceeds of the iFlex litigation.

infected the judge's consideration of KKP's security interest in the iFlex litigation settlement proceeds.

a.  Standard of review.  "We accept the judge's findings of fact in a bench trial unless they are clearly erroneous," Makrigiannis v. Nintendo of Am., Inc., 442 Mass. 675, 677 (2004), and the credibility of the witnesses rests within the purview of the trial judge.  See Mass. R. Civ. P. 52 (a), as amended, 423 Mass. 1402 (1996).

b.  Breach of implied covenant of good faith and fair dealing by PortfolioScope.  The judge found that Portfolioscope committed a breach of the covenant of good faith and fair dealing when it paid $515,000, which constituted more than five per cent of the net proceeds of the iFlex litigation, to Whelihan.  She explained that there was "simply no tenable argument that the [five per cent] [a]greement[17] permitted PortfolioScope to make any payment to Whelihan before paying Weiler."  PortfolioScope takes the position that it did not commit a breach of the covenant of good faith and fair dealing because its payment to Whelihan was directed by KKP -- PortfolioScope's secured creditor.  Its argument is that PortfolioScope was required to comply with KKP's instructions to

---

[17] It is clear from the context that the trial judge was focusing on the five per cent amendment.

pay Whelihan directly.[18]  See G. L. c. 106, § 9-405 (a).  We affirm the judge's finding.

"The covenant of good faith and fair dealing is implied in every contract," Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385 (2004), citing Kerrigan v. Boston, 361 Mass. 24, 33 (1972), including contracts between sophisticated business people.  See Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 473 (1991).  The implied covenant provides "that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract . . . ."  Drucker v. Roland Wm. Jutras Assocs., Inc., 370 Mass. 383, 385 (1976), quoting Uproar Co. v. National Broadcasting Co., 81 F.2d 373, 377 (1st Cir. 1934), cert. denied, 298 U.S. 670 (1936), and "exists so that the objectives of the contract may be realized," Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367, 385, cert. denied sub nom. Globe Newspaper Co. v. Ayash, 546 U.S. 927 (2005).  "A breach occurs when one party violates the reasonable expectations of the other."  Chokel v. Genzyme Corp., 449 Mass. 272, 276 (2007), and cases cited.

"In determining whether a party violated the implied covenant of good faith and fair dealing, we look to the

---

[18] The Appeals Court essentially adopted this rationale in reversing the breach of implied covenant of good faith and fair dealing claim against PortfolioScope.  See Weiler, 83 Mass. App. Ct. 216, 226-227 (2013).

> party's manner of performance. . . .  There is no requirement that bad faith be shown; instead, the plaintiff has the burden of proving a lack of good faith. . . .  The lack of good faith can be inferred from the totality of the circumstances."  (Citations omitted.)

T.W. Nickerson, Inc. v. Fleet Nat'l Bank, 456 Mass. 562, 570 (2010).

PortfolioScope's argument, that the payment to Whelihan was actually a payment ordered by its secured creditor KKP, is at odds with the trial judge's findings concerning the transfers made to Whelihan from the iFlex litigation proceeds.  The judge found that the $500,000 transfer was made "at Kimberlin's direction," and the $15,000 transfer was "authorized by Kimberlin."  What is absent from these findings -- and what is necessary for Portfolioscope's secured creditor argument -- is that Kimberlin authorized or directed these payments on behalf of KKP.  The defendants apparently assume that Kimberlin did so, but do not identify the basis for this assumption; the mere fact that Kimberlin controlled KKP is not a sufficient one.[19]

---

[19] Moreover, a finding that Kimberlin acted on behalf of KKP in directing Whelihan to pay himself from the iFlex litigation proceeds logically would seem to require a corollary finding that KKP credited the $515,000 transferred to Whelihan against PortfolioScope's debt to KKP.  We do not read the judge's decision as including such a finding.  The judge stated, "KKP, L.P. allegedly gave PortfolioScope a $500,000 credit on Portfolioscope's secured debt obligation for the $500,000 Whelihan payment" (emphasis added).  This was the only fact included in the judge's decision that she qualified with "allegedly," and the judge also stated at a different point in her decision, when discussing Weiler's UFTA claim, that

What the judge's findings do indicate is that PortfolioScope, at Kimberlin's direction, transferred $515,000 to Whelihan, who was neither a secured creditor of PortfolioScope nor otherwise entitled to the funds;[20] and that PortfolioScope's $515,000 payment to Whelihan represented more than five per cent of the net proceeds from the iFlex litigation, which was the amount to which Weiler was entitled under the five per cent amendment.[21]  Moreover, the judge found

---

"PortfolioScope received no value in exchange for" the transfers of $515,000 to Whelihan.  Moreover, the only evidence that PortfolioScope did receive credit was the testimony of Kimberlin, a witness the judge discredited in several respects. The defendants did not introduce any financial or other business records of either PortfolioScope or KKP reflecting this alleged credit.  Cf. Automobile Insurers Bur. of Mass. v. Commissioner of Ins., 430 Mass. 285, 291 (1999) (commissioner could properly draw adverse inference from insurers' failure to produce complete information on subject "peculiarly within their control").  Given that the judge's findings quoted here indicate she did not believe Kimberlin's testimony, the factual premise on which the defendants' argument is built does not exist.

At oral argument before this court, counsel for the defendants agreed that, if PortfolioScope had not credited the $515,000 payment to Whelihan against the amount it owed to KKP, the failure to have done so would undermine the defendants' contention that PortfsolioScope's payment to Whelihan constituted a payment to the secured creditor.

[20] The judge expressly discredited Whelihan's testimony that he was "owed" $500,000 for past services rendered to PortfolioScope and various other entities connected to Kimberlin.

[21] The judge's discussion of the implied covenant claim may be read to indicate that she interpreted the five per cent amendment as giving Weiler a right to recover five per cent of the actual iFlex litigation settlement proceeds.  As previously

that these transfers were motivated by a desire to enrich

Whelihan at the expense of Weiler who had provided substantial

services in order to make the iFlex litigation settlement

possible -- a finding which is supported by the evidence.  See

T.W. Nickerson, Inc., 456 Mass. at 574 (looking to whether

defendant's motivation was "to affect negatively the plaintiff's

rights" under the contract to determine whether breach of

implied covenant of good faith and fair dealing occurred).  See

also Chokel, 449 Mass. at 278 n.5; Anthony's Pier Four, Inc.,

411 Mass. at 472-473.  PortfolioScope's argument fails.

    c.  Tortious interference with contractual relations by

Kimberlin.  "To prevail on a claim of tortious interference with

a contract, a plaintiff must establish that '(1) he had a

contract with a third party; (2) the defendant knowingly induced

the third party to break that contract; (3) the defendant's

---

stated, we agree with the defendants and the Appeals Court that
such an interpretation is not correct, but the error has no
significance because the settlement proceeds represented
essentially all of PortfolioScope's assets.  In other words, the
company would have been required to transfer a portion of the
settlement proceeds in order to meet its contractual obligation
to Weiler.

    Although it is true that approximately $1.231 million of
the iFlex litigation settlement funds, which represented more
than five per cent of the net proceeds, purportedly went to
satisfy an escrow order for then pending litigation between
PortfolioScope and Charles Hunt, during the time period involved
in this case, PortfolioScope had no ability to reach that money
to pay Weiler, and there was no guarantee that that sum would
ever be returned to PortfolioScope.

interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions.'" Psy-Ed Corp. v. Klein, 459 Mass. 697, 715-716 (2011), quoting G.S. Enters., Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 272 (1991). Accord Blackstone v. Cashman, 448 Mass. 255, 260 (2007). However, "[w]here the defendant is a corporate official acting in the scope of his corporate responsibilities, a plaintiff has a heightened burden of showing the improper motive or means constituted 'actual malice,' that is, 'a spiteful, malignant purpose, unrelated to the legitimate corporate interest.'" Psy-Ed Corp., supra at 716, quoting Blackstone, supra at 260-261.

The judge concluded that Kimberlin intentionally interfered with Weiler's right to be paid from the iFlex litigation proceeds under the five per cent amendment by authorizing Whelihan to pay $515,000 to himself, and that Kimberlin did so with improper motive or means; the judge did not apply the "actual malice" standard in reaching this result, or even discuss the standard -- presumably because the defendants did not mention this standard or suggest that the standard had any application to this case. The Appeals Court reversed, concluding that because Kimberlin served as chair of the board and sole director of Spencer Trask, which owned ninety per cent of PortfolioScope, he qualified as a "corporate official" of

Portfolioscope to whom the actual malice standard applied, and Weiler failed to meet the "heightened burden" that the standard imposes. Weiler, 83 Mass. App. Ct. at 228. Before this court, Kimberlin embraces the Appeals Court's theory and argues that he is entitled to the actual malice standard because, as the Appeals Court concluded, he was a Portfolioscope "corporate official."

We have stated that "[t]he 'actual malice' standard for proving improper motive or means on the part of a corporate official is a burden placed on the plaintiff, not a defense that must be proved by the defendant." Blackstone, 448 Mass. at 261. See id. at 261 n.10. That the plaintiff must prove a corporate official acted with actual malice, however, does not absolve the defendant from bringing to the attention of the plaintiff and the court in some fashion that he claims to qualify as a "corporate official" of the relevant corporation and therefore is entitled to have the actual malice standard apply. See id. at 256, 259, 268 (defendant, one of two directors of close corporation employing plaintiff, requested actual malice jury instruction at trial; error not to give it). Cf. Teller v. Schepens, 381 Mass. 621, 623 (1980) (once defendant raises statute of limitations issue, plaintiff bears burden of proving claims are not time barred). Cf. also Commonwealth v. Humphries, 465 Mass. 762, 771 (2013) (where defendant was

charged with joint venture possession of firearm, his claim that coventurer possessed license to carry firearm would be defense to charge; defendant not required to produce evidence of coventurer's license, but only bears burden of raising issue of license; once issue raised, burden on Commonwealth to prove coventurer was not licensed).  The need to identify the "corporate official" issue is especially pronounced in a case like the present one, where the complexities of the corporate and individual relationships raise, at best, a possibility that the defendant qualifies as a corporate official.[22]

     To summarize:  only where a defendant raises a claim that he qualifies as a corporate official does the plaintiff then bear the burden of proving either that the defendant does not so qualify and is not entitled to the actual malice standard, or

---

[22] Contrast Weber v. Community Teamwork, Inc., 434 Mass. 761, 762, 781 (2001) (executive director constituted corporate official); King v. Driscoll, 418 Mass. 576, 578, 587 (1994), S.C., 424 Mass. 1 (1996) (shareholder-directors actively involved in management as corporate officials); Gram v. Liberty Mut. Ins. Co., 384 Mass. 659, 660, 663-664 (1981), S.C., 391 Mass. 333 (1984) (direct supervisors entitled to actual malice standard).  In Blackstone v. Cashman, 448 Mass. 255, 267 (2007), this court concluded that a director of a close corporation, even if not involved in the day-to-day operations of the company, still "has an important interest in and responsibility for the conduct of business" because of his status as director, and qualifies as a corporate official to whom the actual malice standard would apply.  The court left open whether the same would be true for a person who was simply a shareholder of a close corporation.  See id. at 267 n.16.  Although, as the judge found, Kimberlin may have exerted practical control over PortfolioScope, he was not an employee, officer, director, or even shareholder of the company.

that the defendant did act with actual malice.  Here, Kimberlin did not argue or suggest at trial (or before the Appeals Court) that he was a "corporate official" of PortfolioScope and thereby was entitled to the actual malice standard.[23]  Rather, he advances it for the first time before this court.  Having failed to raise the issue below, he has waived it.  See Canton v. Commissioner of Mass. Highway Dep't, 455 Mass. 783, 795 n.18 (2010), and cases cited; Mullins v. Pine Manor College, 389 Mass. 47, 63 (1983), citing Royal Indem. Co. v. Blakeley, 372 Mass. 86, 88 (1977) (issues not raised below are usually not considered on appeal unless "the questions presented are of some public importance and the result we reach is not changed by our consideration of them").

The defendants claim also that even if Kimberlin was not entitled to the benefit of the actual malice standard, Weiler failed to establish that Kimberlin used improper motive or means in interfering with the five per cent amendment because Kimberlin, acting on behalf of the secured creditor KKP, was privileged to interfere with Weiler's contract in order to

---

[23] In fact, at trial, Kimberlin emphasized his limited involvement with PortfolioScope for the purposes of defending against Weiler's claim to pierce the corporate veil and hold Kimberlin personally liable for Weiler's claims against PortfolioScope.  Advancing a corporate official claim would run counter to this stance.

further KKP's own legitimate economic interest.[24]  As discussed,

the judge did not find that in directing or authorizing Whelihan

to transfer $515,000 from PortfolioScope to himself (Whelihan),

Kimberlin was acting on behalf of KKP in its capacity as

PortfolioScope's secured creditor.[25,26]

d.  Conversion.  To be liable for conversion, a defendant

must wrongfully "exercise dominion or control over the personal

property of" the plaintiff.  See Third Nat'l Bank of Hampden

---

[24] The Appeals Court adopted this reasoning in concluding
that, even if Kimberlin was not a corporate official, reversal
of the tortious interference claim against him was required.
See Weiler, 83 Mass. App. Ct. at 228-229.

[25] There was ample evidence to support the judge's
conclusion that Kimberlin acted with improper motive or means in
directing that $515,000 be paid to Whelihan, leaving
PortfolioScope with insufficient funds to meet its contractual
commitment to Weiler.  As to improper means, Kimberlin, who was
not an employee, officer, or director of PortfolioScope,
nonetheless personally assumed the right and authority to direct
the transfer of a portion of PortfolioScope's assets -- the
iFlex litigation settlement proceeds -- to Whelihan and
assiduously concealed the transfer from Weiler for months,
impeding Weiler's ability to recover what was due to him.  As to
improper motive, the judge in substance found that Kimberlin
directed the transfer in an effort to benefit Whelihan, his
consultant for Spencer Trask who otherwise was not entitled to
the $515,000, to the detriment of Weiler, who had a legitimate
contractual claim to the money.

[26] The defendants' sole argument as to why Weiler's claim
for civil conspiracy cannot stand is that there was no
underlying tort to which they could conspire.  The argument
fails in light of our affirmance of the claim of tortious
interference with contractual relations against Kimberlin.
Moreover, the finding that the defendants conspired to
tortiously interfere with Weiler's contractual relations is
amply supported by the record.

County v. Continental Ins. Co., 388 Mass. 240, 244 (1983).

Accord Spooner v. Holmes, 102 Mass. 503, 506 (1869). The

defendants argue that the conversion claim cannot stand because

the iFlex litigation proceeds never constituted Weiler's

property. Weiler counters that money can be the subject of

conversion, and, therefore, the judge correctly held the

defendants liable for converting Weiler's five per cent share of

the iFlex litigation net proceeds pursuant to the five per cent

amendment. Weiler is correct that conversion may lie if an

individual wrongly exercises dominion or control over the money

of another. Matter of Hilson, 448 Mass. 603, 611 (2007), citing

Morrin v. Manning, 205 Mass. 205, 211 (1910). However, as

previously stated, we agree with the defendants and the Appeals

Court, see Weiler, 83 Mass. App. Ct. at 223, that under the

terms of the five per cent agreement and five per cent

amendment, Weiler was entitled to the value of five per cent of

the net proceeds of the iFlex litigation; the contractual

documents did not give him a right to five per cent of the iFlex

litigation funds themselves. Contrast Matter of Hilson, supra.

Therefore, the judgment for Weiler on his conversion claim must

be reversed.

e. Fraudulent transfers. Under UFTA, a transfer made by a

debtor before or after the creditor's claim arose is fraudulent

if made with actual intent to hinder, delay, or defraud, see

G. L. c. 109A, § 5 (a) (1), or if made without receiving the reasonably equivalent value of the property in exchange and after the transfer, the debtor would not have enough assets to carry on its business or pay expected creditors.  See G. L. c. 109A, § 5 (a) (2).[27]  The judge concluded that the defendants violated UFTA, based on her finding that the transfers were made with the actual intent to hinder, delay, or defraud Weiler.  See G. L. c. 109A, § 5 (a) (1).  With respect to the $515,000 transferred by PortfolioScope to Whelihan, the judge pointed to the following:  (1) at the time of the transfers, Whelihan was not a secured or even an unsecured creditor of PortfolioScope, and Portfolioscope received no value in exchange for the

---

[27] General Laws c. 109A, § 5 (a), provides in pertinent part:

"A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

"(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

"(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

"(i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

"(ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due."

transfers;[28] (2) Whelihan was an "insider," see G. L. c. 109A,
§ 2; (3) the settlement proceeds as a whole represented
substantially all of PortfolioScope's assets; and (4) Whelihan
and Kimberlin attempted to conceal the transfers while
simultaneously delaying response to Weiler's requests to be
paid. As to the $6.496 million[29] transferred by PortfolioScope
to the Spencer Trask brokerage account, the judge observed that:
(1) the transfers were made to Spencer Trask, a PortfolioScope
insider, for the benefit of KKP, controlled by Kimberlin; (2)
the transfers involved substantially all of PortfolioScope's
assets, rendering it insolvent; (3) KKP never perfected its
security interest until after Weiler commenced this litigation;
(4) neither Whelihan nor Kimberlin ever informed Weiler that
PortfolioScope was unable to pay him because it was required to
pay its secured creditor, KKP; and (5) both Kimberlin and
Whelihan engaged in a series of actions that were intended to

---

[28] The judge expressly discredited Whelihan's testimony that
he was owed $500,000 for his work both at PortfolioScope and at
Spencer Trask. She further rejected Whelihan's assertion that
he had been working for years as a Spencer Trask employee
without compensation, citing the fact that Whelihan was
receiving a monthly $9,000 retainer from Spencer Trask.

[29] This sum consisted of the $5.2 million wired on
November 12 and the $1.296 million wired on November 17. The
judge did not find the approximately $1.231 million transfer,
apparently designed to satisfy the Superior Court escrow order
in the Hunt litigation, to be a fraudulent transfer under UFTA.

conceal the transfers from Weiler and avoid his attempts to collect what was due him.[30]

The defendants contend that the trial judge's finding that the transfers to Whelihan and to Spencer Trask were made with intent to hinder or delay was clearly erroneous.  We disagree.[31]

i.  Transfers to Whelihan.  The defendants' only argument as to why the transfers made to Whelihan are not fraudulent within the meaning of UFTA is that the payment to Whelihan was, in actuality, a transfer to KKP, PortfolioScope's secured creditor.  As discussed, the trial judge's findings do not support this factual claim, therefore the issue of paying a secured creditor is irrelevant.  The question that remains is whether the evidence showed that the Whelihan transfers were made with actual intent to hinder, delay, or defraud, or more particularly, whether the judge's finding that they were made

---

[30] The Appeals Court concluded that the transfers at issue did not violate UFTA.  Weiler, 83 Mass. App. Ct. at 231-233. That court reasoned that, because "the transfers were made at the instruction of KKP, a secured creditor and holder of a demand note," id. at 232, Weiler was required to prove that PortfolioScope received some hidden benefit in making the transfers.  Id. at 232-233.

[31] Essentially, the defendants' argument is that KKP was a secured creditor of PortfolioScope, that the various transfers were made in satisfaction of that security interest, and that accordingly they are insulated from being found to have violated UFTA.  Additionally, they claim that there was insufficient evidence to support the finding that the transfers to Spencer Trask were to an "insider," and to support the finding that PorfolioScope became insolvent as a result of the transfers.

with such intent was clearly erroneous.  Cf. Max Sugarman

Funeral Home, Inc. v. A.D.B. Investors, 926 F.2d 1248, 1255 (1st

Cir. 1991) (finding of actual intent to hinder, delay, or

defraud under § 548 of United States Bankruptcy Code "is a

finding of fact, which [is] not disturb[ed] absent clear

error").[32]

General Laws c. 109A, § 5 (b), provides a nonexclusive list

of factors that may be considered in determining whether the

parties made the transfers with actual intent to hinder, delay,

or defraud.[33]  See Alford v. Thibault, 83 Mass. App. Ct. 822, 828

---

[32] See In re Spatz, 222 B.R. 157, 164 (N.D. Ill. 1998)
(noting that provisions of UFTA parallel § 548 of Bankruptcy
Code).

[33] The factors set forth in G. L. c. 109A, § 5 (b), are
whether:

> "(1) the transfer or obligation was to an insider;

> "(2) the debtor retained possession or control of the
> property transferred after the transfer;

> "(3) the transfer or obligation was disclosed or
> concealed;

> "(4) before the transfer was made or obligation was
> incurred, the debtor had been sued or threatened with suit;

> "(5) the transfer was of substantially all of the
> debtor's assets;

> "(6) the debtor absconded;

> "(7) the debtor removed or concealed assets;

(2013). "While the 'presence of a single badge of fraud may spur mere suspicion, the confluence of several can constitute conclusive evidence of an actual intent to defraud.'" Hasbro, Inc. v. Serafino, 37 F. Supp. 2d 94, 98 (D. Mass. 1999), quoting Max Sugarman Funeral Home, Inc., supra at 1254-1255.

The subsidiary findings listed by the judge in support of her ultimate finding of actual intent included at least four indicia listed in UFTA, see G. L. c. 109A, § 5 (b): the transfers to Whelihan, the chief executive officer of PortfolioScope, were to an insider, see § 5 (b) (1)[34]; Whelihan and Kimberlin concealed the transfers from Weiler, see § 5 (b) (3); the transfers to Whelihan, combined with the virtually simultaneous transfers to Spencer Trask, accounted for substantially all of PortfolioScope's assets at that time, see

---

"(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

"(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

"(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

"(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor."

[34] See also G. L. c. 109A, § 2 (officer of debtor corporation is insider for purposes of UFTA).

§ 5 (b) (5); and, because Whelihan was not a secured or unsecured creditor of PortfolioScope and had no entitlement to any portion of the iFlex litigation settlement proceeds, PortfolioScope received no value -- much less something of equivalent value -- as a result of the transfer, see § 5 (b) (8).  As the trial evidence supports these findings, the judge's determination that the transfer of $515,000 to Whelihan was made with intent to hinder, delay, or defraud was not clearly erroneous.

ii.  Transfers to Spencer Trask.  Kimberlin principally argues that because KKP was a secured creditor of PortfolioScope, the approximately $6.5 million in transfers to KKP through Spencer Trask represented a preference of paying one creditor over another, and, therefore, it is not fraudulent under UFTA.  "Fraudulent conveyance laws, such as the Bankruptcy Code and [S]tate statutes adopting some form of the Uniform Fraudulent Conveyance Act or the Uniform Fraudulent Transfers Act, are intended to prevent shareholders, secured creditors, and others from benefitting at the expense of others, including unsecured creditors" (emphasis added).  In re Hechinger Inv. Co. of Del., 274 B.R. 71, 81 (D. Del. 2002).  Accordingly, compliance with the law of secured transactions, see G. L. c. 106, §§ 9-101 to 9-709, does not by itself protect a secured creditor from a fraudulent transfer claim.  See Steel Co. v.

Morgan Marshall Indus., Inc., 278 Ill. App. 3d 241, 250-252 (1996) (although no dispute that art. 9 of Uniform Commercial Code was complied with, genuine issue of material fact remained whether transfers made with actual intent to defraud). Cf. Sheffield Progressive, Inc. v. Kingston Tool Co., 10 Mass. App. Ct. 47, 50 (1980), quoting 1B Coogan, Hogan & Vagts, Secured Transactions under the Uniform Commercial Code § 13.07(1), at 1381 (1980) ("Clearly, article 9 does not replace the Uniform Fraudulent Conveyance Act").

Cases decided before the enactment of UFTA in Massachusetts have stated that when a debtor has paid one creditor over another, even when the payment comprised substantially all of the debtor's assets, this fact by itself is insufficient to establish an intent to hinder, delay, or defraud. See, e.g., Goldstein v. Columbia Diamond Ring Co., Inc., 366 Mass. 835, 843-844 (1975). See also Mason v. Wylde, 308 Mass. 268, 281-283, cert. denied, 314 U.S. 638 (1941). Implicit in those cases, however, is a premise that the debtor is acting in good faith in making the challenged transfers -- that the debtor's motivation or purpose in doing so was to pay the creditor the antecedent debt, not to advance a goal of secretly benefiting the debtor's own, personal interests at the expense of the unpaid creditor. See Mason, supra at 282-283. As to the approximately $6.5 million in transfers to Spencer Trask, the

judge expressly rejected a conclusion that PortfolioScope, acting through Whelihan and Kimberlin in effecting these transfers, was acting in good faith, concluding instead that the defendants' purpose was to benefit Kimberlin and Whelihan at Weiler's expense.  And, as is true of the transfers to Whelihan, the indicia of actual intent to hinder, delay, or defraud found by the judge -- the defendants' failure at the time of making the transfers to explain to Weiler that PortfolioScope was unable to pay him because of the need to pay its secured creditor KKP; their concealment from Weiler of the transfers; and the fact that the transfers to Spencer Trask, combined with the transfers to Whelihan, constituted substantially all of PortfolioScope's assets -- are supported by the evidence.[35,36]

---

[35] The judge also found that the $6.5 million in transfers to Spencer Trask effectively rendered PortfolioScope insolvent. The defendants, as noted, contend that this finding was clearly erroneous.  It may be that the evidence failed to show that PortfolioScope was insolvent within the meaning of UFTA, see G. L. c. 109A, § 3.  Nevertheless, there still is sufficient evidence of actual intent to hinder, delay, or defraud to affirm the judge's conclusion that the transfers were fraudulent under § 5 (a) (1) of UFTA.

[36] The defendants argue that, although Spencer Trask may have qualified as an insider under UFTA as it was a ninety per cent owner of PortfolioScope, Spencer Trask was a transferee in "name only"; the actual transferee was KKP, its secured creditor.  We are not convinced that we should ignore that Spencer Trask was the initial transferee for purposes of UFTA, especially where Kimberlin admitted that he did not have a "good answer" as to why he directed Whelihan to wire the settlement proceeds purportedly for KKP to a Spencer Trask brokerage account.  In any event, even if the transfers were not made to

e.  G. L. c. 93A, § 11.  The trial judge concluded that by improperly using the iFlex litigation settlement proceeds to benefit themselves rather than meeting PortfolioScope's contractual obligations to pay Weiler and by intentionally misleading and concealing their improper conduct, the defendants acted unfairly or deceptively within the meaning of G. L. c. 93A, § 11, and did so knowingly and wilfully, entitling Weiler to double damages and attorney's fees.  The Appeals Court disagreed.  Although the defendants had not raised the issue in the Superior Court or on appeal, the Appeals Court concluded that Weiler was not entitled to recover under G. L. c. 93A, § 11, because "the dispute . . . arose out of a private transaction between PortfolioScope and Weiler in his role as a former employee and options holder of the company," Weiler, 83 Mass. App. Ct. at 230, and as a result Weiler did not meet the trade or commerce requirement of the statute.  Id. at 230-231. Weiler argues that the defendants have waived this defense -- that it is too late for them to take up the intra-corporate transaction banner at this stage of the case.  The defendants do not contest that they did not previously raise this issue, but claim that the "trade or commerce" requirement of c. 93A, § 11,

---

an insider, they were nonetheless made to an entity with which PortfolioScope "had an intimate financial relationship."  Max Sugarman Funeral Home, Inc. v. A.D.B. Investors, 926 F.2d 1248, 1255 (1991).

goes to the court's subject matter jurisdiction and therefore cannot be waived.

Our cases make clear that G. L. c. 93A, § 11, does not cover internal employment or intra-enterprise disputes.  See, e.g., Selmark Assocs., Inc. v. Ehrlich, 467 Mass. 525, 549-551 (2014); Psy-Ed Corp., 459 Mass. at 719-720; Manning v. Zuckerman, 388 Mass. 8, 12-15 (1983).  This does not mean, however, that the Superior Court lacks jurisdiction even to entertain arguments that the plaintiff's claim of unfair or deceptive conduct on the part of various individuals and entities falls squarely within the proper "trade or commerce" scope of § 11, and is not a private employment or intra-corporate dispute.  See G. L. c. 93A, § 11, first par. (granting Superior Court jurisdiction to hear such claims).[37]  See also Wachovia Bank, Nat'l Ass'n v. Schmidt, 546 U.S. 303, 316 (2006) (question for purposes of subject matter jurisdiction is, "Has the Legislature empowered the court to hear cases of a certain

---

[37] General Laws c. 93A, § 11, first par., provides in relevant part:

> "Any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property . . . as a result of the use or employment by another person who engages in any trade or commerce of an unfair or deceptive act or practice declared unlawful by [§ 2] . . . may, as hereinafter provided, bring an action in the superior court . . . for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper."

genre?"); Doe, Sex Offender Registry Bd., No. 3974 v. Sex Offender Registry Bd., 457 Mass. 53, 56-57 (2010).[38]  Our cases routinely have addressed the argument or defense that a dispute is intra-corporate in nature, and therefore fails to satisfy the "trade or commerce" requirement of § 11, as a basis for a motion to dismiss for failure to state a claim upon which relief can be granted under Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974).  See, e.g., First Enters., Ltd. v. Cooper, 425 Mass. 344, 345 n.3, 347-348 (1997) (analyzing whether G. L. c. 93A, § 11, claim

_____

[38] Our cases addressing whether an issue is one of subject matter jurisdiction have distinguished between the general "'nature of the case assigned' to [the court]," which implicates the court's subject matter jurisdiction, and "the elements of a prima facie case before the [court]," which do not.  Doe, Sex Offender Registry Bd., No. 3974 v. Sex Offender Registry Bd., 457 Mass. 53, 57 (2010) (Doe, No. 3974).  See Wachovia Bank, Nat'l Ass'n v. Schmidt 546 U.S. 303, 316 (2006) ("Subject matter jurisdiction . . . concerns a court's competence to adjudicate a particular category of cases").  Here, the Superior Court is clearly granted the authority to hear G. L. c. 93A claims.  See G. L. c. 93A, §§ 9 (1) and 11.  Whether the parties were engaged in "trade or commerce" at the time the alleged unfair or deceptive practices occurred is a substantive question.  Cf. Doe, No. 3974, supra at 57 (whether sex offender was person who resides in Massachusetts, which board was required to prove for statutory definition of "sex offender," was substantive question not going to board's subject matter jurisdiction, and was waived when not raised until appeal); Middleborough v. Housing Appeals Comm., 449 Mass. 514, 520-521 (2007) (requirement that project be "fundable" before permit decision could be challenged was substantive as opposed to jurisdictional).  Contrast St. Joseph's Polish Nat'l Catholic Church v. Lawn Care Assocs., Inc., 414 Mass. 1003, 1003 & n.1 (1993) (Housing Court lacked jurisdiction to hear G. L. c. 93A action where claim was that defendant failed "properly to perform an agreement for grading, seeding and paving work on a cemetery owned by the plaintiff," as claims were only tangentially related to housing).

was properly dismissed for failure to state claim under rule 12 [b] [6] because it constituted intra-enterprise dispute); Manning, 388 Mass. at 9, 12-14 (same); Cavicchi v. Koski, 67 Mass. App. Ct. 654, 655, 662-663 (2006) (same).  We continue to view a rule 12 (b) (6) motion as the proper vehicle for a party to raise such a defense.  A rule 12 (b) (6) motion, however, does not implicate the court's subject matter jurisdiction, and it may be waived.  See Mass. R. Civ. P. 12 (h) (2), 365 Mass. 754 (1974) (failure to state claim on which relief can be granted may be raised by pleading, motion to dismiss, motion for judgment on pleadings, or at trial).  Compare Mass. R. Civ. P. 12 (h) (3), 365 Mass. 754 (1974) ("Whenever it appears by suggestion of a party or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action" [emphasis added]).  Because the defendants did not raise the issue of employment or intra-enterprise dispute before judgment entered in the Superior Court (and also did not raise the issue before the Appeals Court), it is waived.[39]  The

---

[39] Although we do not decide the issue, it is far from clear that the dispute here in any event could qualify as a private, employment-related or intra-enterprise controversy outside the trade or commerce boundary line of G. L. c. 93A, § 11. Kimberlin was not a stockholder, officer, director, or employee of PortfolioScope, there are a variety of separately organized entities involved in this case, and the conduct of the defendants giving rise to Weiler's claim under § 11 took place six years after the five per cent agreement and five per cent amendment were signed –– six years in which Weiler had been

defendants do not challenge the judge's disposition of Weiler's c. 93A claim on any other ground, and therefore, the judgment on this claim is affirmed.

3. <u>Conclusion</u>.  The judgment of the Superior Court is affirmed as to all counts of the first amended complaint with the exception of count 9 for conversion, and as to that count, the judgment is reversed.

<u>So ordered</u>.

---

working not as an employee of PortfolioScope but as a consultant.  In short, the factual circumstances of this case appear to be significantly different from the direct employer-employee or shareholder-corporation disputes to which we have held G. L. c. 93A inapplicable.  Contrast, e.g., <u>Selmark Assocs., Inc</u>. v. <u>Ehrlich</u>, 467 Mass. 525, 550 (2014), quoting <u>Milliken & Co</u>. v. <u>Duro Textiles, LLC</u>, 451 Mass. 547, 563 (2008); <u>Zimmerman</u> v. <u>Bogoff</u>, 402 Mass. 650, 662-663 (1988) (G. L. c. 93A inapplicable to transactions and disputes between fellow shareholders in close corporation); <u>Manning</u> v. <u>Zuckerman</u>, 388 Mass. 8, 15 (1983) (G. L. c. 93A in applicable to dispute between employer and employee).